In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3280

KEVIN B. ARNETT,

*Plaintiff-Appellant,*

*v.*

THOMAS A. WEBSTER, M.D., et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Terre Haute Division.
No. 2:08-cv-099-WTL-WGH—**William T. Lawrence**, *Judge.*

ARGUED MARCH 30, 2011—DECIDED SEPTEMBER 12, 2011

Before FLAUM, WOOD, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.*  Kevin Arnett, a former prisoner at the Bureau of Prisons Federal Correctional Complex in Terre Haute, Indiana, brought this *Bivens* action, *see Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), for cruel and unusual punishment under the Eighth Amendment against a number of prison officials for violations he alleged occurred during his ten month stay there. When Arnett arrived at the

Terre Haute facility in November 2006, he was seen by Thomas Webster, M.D., prison clinical director. Arnett informed Dr. Webster that he had rheumatoid arthritis (RA), a severe and debilitating form of arthritis which is progressive and causes painful inflammation of the joints and surrounding tissues, and asked for Enbrel (etanercept), a medication Arnett had been taking before arriving at the prison that had been successful in controlling his condition.

Because Enbrel wasn't on the prison's approved formu-lary, prison medical personnel had to seek prior ap-proval to prescribe the medication by submitting a non-formulary drug authorization request to the Central Office of the Bureau of Prisons in Washington, D.C. (BOP) Dr. Webster submitted a request for Arnett to receive Gabapentin, used to treat nerve pain, but not Enbrel, and also submitted approval for a consultation with an outside rheumatologist. W. Eric Wilson, M.D., staff physi-cian at Terre Haute, became Arnett's primary care physi-cian on December 28, 2006. An outside rheumatologist examined Arnett in February 2007, and it can be inferred that he directed Dr. Wilson to place Arnett back on Enbrel. Despite the rheumatologist's instruction and Arnett's repeated pleas for the medication and complaints of continued pain and swelling, he didn't receive Enbrel until October 5, 2007, eleven days before he was trans-ferred from the facility to a halfway house. Arnett was told by the defendants during the more than ten months he waited for the drug that the non-formulary request had been submitted, they were waiting for a response from the BOP, and were otherwise "working on it." In the

meantime, Arnett was prescribed pain medicine, but nothing to treat the inflammation and deterioration of his joints.

Because Arnett sought leave to proceed in forma pauperis, the district court screened his complaint pursuant to 28 U.S.C. § 1915(e)(2)(B), and in so doing, dismissed all the defendants, except Dr. Webster, on the basis that Arnett failed to state a claim upon which relief could be granted. (Shortly after screening, Arnett's case was transferred from Judge Richard L. Young to Judge William T. Lawrence.) Dr. Webster then filed a summary judgment motion and the district court granted that motion. The district court entered judgment, directing that plaintiff take nothing by his complaint. Arnett appeals both rulings and we affirm in part and reverse in part. We affirm dismissal of the non-medical defendants on the pleadings, but find that Arnett properly stated a claim against the medical defendants. We, however, affirm the district court's grant of summary judgment in favor of Dr. Webster because Arnett failed to meet his burden to submit evidence upon which a reasonable jury could find that Dr. Webster acted with deliberate indifference.

## I.  Facts

Arnett brought this suit against the following Terre Haute prison employees for violation of his Eighth Amendment rights: Warden Richard Veach, Health Services Administrator Julia Beighley, Case Manager David Parker, Staff Physician W. Eric Wilson, M.D., Physician's

Assistant Yves A. Paul-Blanc, and Clinical Director Thomas A. Webster, M.D. (Arnett also sued the Federal Bureau of Prisons, but recognizing that dismissal of the BOP was proper, he has not appealed that ruling.) Because we are reviewing a dismissal at both the pleading and summary judgment stage, we begin by setting forth the allegations and facts in Arnett's complaint and documents attached thereto. *See Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (On a motion to dismiss "[w]e consider documents attached to the complaint as part of the complaint itself.")

In 2001, Arnett was diagnosed with RA by his treating physician, Steven R. Bergquist, M.D. RA involves autoimmune reactions and is a progressive disease that causes pain and inflammation in the joints.[1] After other medications proved unsuccessful in controlling his condition, Dr. Bergquist placed Arnett on the drug Enbrel in January 2004. Enbrel reduces joint swelling, helps prevent

---

[1] The defendants argue that there is nothing in the record to support these facts, but they can be found in Dr. Bergquist's September 5, 2007, letter that was attached to Arnett's complaint. We also note that several authoritative sources support this description of the disease. *See The Merck Manual of Diagnosis and Therapy* 283-89 (18th ed. 2006) (stating that RA is a chronic autoimmune disease resulting in progressive destruction of the joints). While Arnett will need to present admissible evidence to substantiate such facts for purposes of summary judgment, he does not need to do so at the pleading stage.

damage to the joints,[2] and was effective in decreasing Arnett's inflammation and accompanying pain. Enbrel is a protein that inhibits inflammation in the body by suppressing a substance produced by the immune system known as tumor necrosis factor (TNF).[3] Subsequently, Arnett was convicted of a federal criminal offense and sentenced to imprisonment. He self-surrendered at the Terre Haute prison on November 1, 2006, and when he arrived, he brought his Enbrel medication, but prison officials confiscated it upon arrival.

---

[2] Enbrel is used to reduce the progression of RA. *See The Merck Manual of Diagnosis and Therapy* 289; *see also Physicians' Desk Reference* 631 (65th ed. 2011) ("Enbrel is indicated for reducing signs and symptoms, . . . inhibiting the progression of structural damage, and improving physical function in patients with moderately or severely active [RA]."). The defendants' characterization of Enbrel as "pain medication" is a misnomer.

[3] This fact isn't found in Arnett's complaint or attached documents, but we state it here to provide relevant background information. It can be found in the summary judgment record in a letter from Dr. Bergquist dated April 20, 2009. This information is supported by Enbrel's website and authoritative text. *See http://www.enbrel.com/what-is*-ENBREL.jspx (last visited Sept. 7, 2011) ("People with inflammatory diseases such as rheumatoid arthritis . . . have too much TNF in their bodies. Enbrel reduces levels of the active form of TNF."); *see also Mosby's Nursing Drug Reference* 491-92 (25th ed. 2012) (stating that Enbrel "[b]inds [TNF], which is involved in immune and inflammatory reactions."); *Physicians' Desk Reference* 639 ("Enbrel can reduce the effect of TNF in the body and block the damage that too much TNF can cause . . . .").

During the next ten months, Arnett lodged numerous oral and written complaints to the defendants for Enbrel, but to no avail. Dr. Webster examined Arnett twice in November 2006. During both exams, Arnett told Dr. Webster that he needed Enbrel to control his RA and that because he didn't have the medication, his joints were swollen, especially his knees, and he was in intense pain; this resulted in Arnett having to walk with a cane. Dr. Webster agreed that Arnett's joints were swollen. In response to his requests for Enbrel, Dr. Webster said, "We'll work on it." Dr. Webster attested that he has no recollection of meeting with Arnett or discussing his request for Enbrel. Arnett also informed Warden Veach in December 2006 that his Enbrel had been confiscated by prison employees and that he needed it to control his RA. Veach told Arnett to talk to Health Services Administrator Beighley. Arnett complained to Beighley and she told him to put his request in writing, which he did.

Dr. Wilson became Arnett's primary physician at the prison beginning December 28, 2006; he saw Arnett every other month until his transfer from the facility in October 2007. Each time he met with Dr. Wilson, Arnett informed him he needed Enbrel and without it, he suffered from joint swelling, particularly in his knees. Dr. Wilson examined Arnett's knees and other joints and agreed they were swollen. In response to Arnett's request, Dr. Wilson stated that he had filled out new forms to get Enbrel that had to be sent to the BOP in Washington, D.C.

Arnett's medical file was presented to the prison's utilization review committee on November 16, 2006, for consideration of Dr. Webster's recommendation that Arnett receive a consultation with a rheumatologist for his RA; the committee concurred that review of Arnett's condition by an outside consultant was warranted. Arnett was seen by Dr. Henry Davis, a rheumatologist, on February 7, 2007. Dr. Davis wrote a letter to Dr. Wilson that Arnett attached to his complaint. The letter explained that Arnett's RA had caused him "acute swelling and pain in his hands, wrists, knees, and neck" and that when he started on Enbrel, he did "fairly well," but has been without it for the last four months. Dr. Davis noted that Arnett had "been taking Percocet and Norco without any benefit." During his examination, Dr. Davis noted swelling and tenderness in different areas of Arnett's body and gave him an injection of Depo-Medrol (medication used to treat joint pain and swelling that occurs with arthritis) in his right shoulder. He stated to Dr. Wilson, "I would like for [Arnett] to resume Enbrel 15 mg once a week." (More will be said about Dr. Davis' comment later.) Arnett still did not receive Enbrel, so in April 2007, he again informed Veach that he needed the drug to control his RA. Veach again told Arnett to talk to Beighley. Arnett's medical chart dated April 4 noted that Arnett was having pain in his right knee and that he received "Enbrel injections, but that was stopped when he arrived here."

Between February and July 2007, Arnett directed two more oral requests to Beighley for Enbrel. Beighley stated that a request for the medication had been submitted,

but it had not arrived. On June 28, 2007, Arnett filed a written request with Beighley for Enbrel, and stated that he was in intense pain from his joints swelling (he described his pain, "I'm walking on bone on bone and have a lot of pain in my knee"), had not been provided a substitute for Enbrel, and had not been seen by the orthopedic specialist as promised. He requested that he be seen by either a rheumatologist or an orthopedic specialist so he could get an injection in his knee to relieve the pain. Beighley responded, "You are on the list to be seen by the ortho." On July 26, Arnett was evaluated by an orthopedic surgeon for complaints of right knee pain related to his RA condition and the surgeon injected Arnett's knee with Depo-Medrol.

Arnett began seeing Physician's Assistant Paul-Blanc on a daily basis beginning in May 2007. Each time he saw Paul-Blanc, Arnett reiterated his plea for Enbrel and stated that because he had not been taking the drug, his joints were swollen and he was in intense pain. Paul-Blanc agreed that Arnett's joints were swollen. In response to Arnett's requests, Paul-Blanc stated that a request for the drug had been made but that he had not yet heard anything from Washington, D.C. Starting in May 2007, Arnett also went to Case Manager Parker two to three times a week and requested that he be placed on Enbrel. Parker told him to "talk to Blanc." Arnett also filed an administrative claim for damages with Parker, which Parker denied. Arnett appealed to Veach, who also denied the claim.

On September 5, 2007, upon Arnett's request, Dr. Bergquist (Arnett's former physician) wrote a letter to the

prison ("To Whom it May Concern") that Arnett attached to his complaint. Dr. Bergquist stated that Arnett had been under his care for RA since June 2001, that he had been on numerous medications and either did not tolerate the medications or did not show improvement, and that when taking Enbrel, his joint pain and swelling decreased. Dr. Bergquist pointed out that RA is a progressive disease and if the pain and swelling of the joints is not controlled, further joint damage can occur. He concluded that he thought it "appropriate for Mr. Arnett to be reevaluated by a rheumatologist to help make the decision as to the best treatment for Mr. Arnett's rheumatoid arthritis." Apparently in response to Dr. Bergquist's letter, the prison finally gave Arnett an injection of Enbrel. He was released from prison eleven days later on October 16.

Arnett alleged that the "intentional refusal by the Federal Bureau of Prison's personnel to give [him] the medication Enbrel . . . constitute[d] a deliberate indifference to [his] obvious medical condition by those defendants, thereby resulting in substantial pain and suffering . . . and irreversible physical damage and deformity of his joints." He asserted that he was simply left untreated during this ten-month plus delay while he "unnecessarily suffered from continual and ongoing pain and advancing physical deterioration" in violation of the Eighth Amendment.

We now turn to the summary judgment record, supplementing the facts set forth above only where necessary and construing those facts in light most favorable to

Arnett. When Arnett arrived at Terre Haute, he had several medical problems in addition to RA, including chronic Hepatitis C, which resulted in over twenty-two encounters with the medical department or medical consultations with specialists during his stay at Terre Haute. Dr. Webster did a full physical exam on Arnett a few days after he self-surrendered at the prison and again on November 16. Dr. Webster reviewed Arnett's medical records, and Arnett informed him that he was previously prescribed Enbrel and that this drug was effective in controlling his RA and alleviating the pain and swelling in his joints. (Dr. Webster disputes any awareness that Arnett was taking Enbrel before his arrival at the prison, but Arnett has presented evidence supporting this fact, and we must accept it as true.) Dr. Webster was also aware that Arnett had been taking the drug Gabapentin to treat neuropathy (nerve damage) and resulting nerve pain. Gabapentin, like Enbrel, was not on the prison's approved formulary. When a drug is not on the approved list, a physician wanting to prescribe the medication must submit a non-formulary drug authorization request to the BOP for approval. Dr. Webster completed such a request for Gabapentin and authorized Arnett's temporary continued use of the drug for fourteen days, pending the decision of the non-formulary request. Dr. Webster did not submit a request for Enbrel. He issued Arnett a pass for a lower bunk, renewed his pain medication Percocet, ordered x-rays, and submitted an approval for a consultation with a rheumatologist to the prison review committee.

Arnett was then assigned to Dr. Wilson. Arnett's medical chart on December 28, 2006, indicates: "RA; referral to rheumatology pending, trying to get Enbrel but need this consult first as central office requires it (it is obvious he has RA)." As discussed above, the request for an outside consultation was approved and Arnett saw Dr. Davis in February 2007. Dr. Webster averred that he was not Arnett's primary care physician and "had no personal involvement with Plaintiff's medical care other than reviewing his chart and medications when he first arrived at FCC Terre Haute." He reiterated, "I was not Plaintiff's primary care physician and had no involvement with the request for Enbrel."A few weeks after his February 2007 exam by Dr. Davis, however, Arnett saw Dr. Webster in the medical unit and pointed out that Dr. Davis stated he should be placed back on Enbrel. Arnett asked Dr. Webster what he had done about getting approval for Enbrel and Dr. Webster responded, "We're working on it."

Arnett's prescription for Percocet continued to be renewed. The non-formulary request for Gabapentin was denied, so he was instead prescribed a new pain medication, Topamax, in December 2006. These drugs were prescribed for their use in alleviating pain, not reducing inflammation or slowing the progression of RA. In April 2007, Arnett was seen during sick call for complaints of right knee pain; x-rays were ordered and a consent for orthopedic consultation was completed. On July 9, Arnett was evaluated during a chronic care clinic visit. The record indicates that he continued to complain of joint pain and pressure in his knees and that he "[w]as

to receive Enbrel but hasn't. Never heard back from the non-formulary request." The record further indicates "Request Enbrel again" and "Request follow up with rheumatology." It then reads, "Start: Enbrel 15 mg sq per week (non formulary submitted)." In July, Dr. Webster also signed a record of medical care stating that the utilization review committee approved a follow-up appointment with Dr. Davis to consult for RA "ASAP." A consultation sheet that same day states "Schedule follow up consult for [RA] . . . Advised to start Enbrel." Dr. Wilson submitted a request for a follow up consultation with Dr. Davis. Arnett's medical charts indicate that he was finally given Enbrel on October 5, 2007. He was transferred to a half-way house on October 16.

## II. Discussion

The district court dismissed Warden Veach from this action on the basis that he only had an administrative role and dismissed all the other defendants, except Dr. Webster, on the basis that there was no allegation in the complaint suggestive that these defendants acted with the requisite mental state of deliberate indifference to support a claim under the Eighth Amendment. The district court (after the case was transferred to a different judge) then granted summary judgment in favor of Dr. Webster reasoning that Arnett failed to submit evidence showing a genuine issue of material fact that Dr. Webster was deliberately indifferent to his serious medical needs. We agree that Arnett failed to state a claim against the non-medical defendants, Veach and

Parker, but disagree that Arnett's allegations were insufficient to state a claim against the medical defendants, Dr. Wilson, Beighley, and Paul-Blanc. We agree, however, that the record on summary judgment is insufficient to allow a reasonable jury to infer that Dr. Webster acted with deliberate indifference.

"The Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).[4] Prison officials violate the Constitution if they are deliberately indifferent to prisoners' serious medical needs. *Estelle*, 429 U.S. at 104. Accordingly, a claim based on deficient medical care must demonstrate two elements: 1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition. *See Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006); *see also Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). "Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the

---

[4] Many of the cases cited in this opinion arose under 42 U.S.C. § 1983. *Bivens* authorizes the filing of constitutional tort suits against federal officers in much the same way that 42 U.S.C. § 1983 authorizes such suits against state officers. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009) (stating that a *Bivens* action is the federal analog to suits brought against state officials under § 1983); *see also King v. Fed. Bureau of Prisons,* 415 F.3d 634, 636 (7th Cir. 2005) (same).

Constitution." *Rodriguez*, 577 F.3d at 828 (quoting *Estelle*, 429 U.S. at 103).

The defendants don't disagree that Arnett suffered from a serious medical condition. *See Norfleet v. Webster*, 439 F.3d 392, 395 (7th Cir. 2006) (finding that rheumatoid arthritis is a serious medical need). And because it is undisputed that the defendants were aware of this serious medical need, our focus is on whether they acted with deliberate indifference in their response. Deliberate indifference is a subjective standard. *Johnson*, 444 F.3d at 585. To demonstrate deliberate indifference, a plaintiff must show that the defendant "acted with a sufficiently culpable state of mind," something akin to recklessness. *Id.* A prison official acts with a sufficiently culpable state of mind when he knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk. *Roe*, 631 F.3d at 857. Deliberate indifference "is more than negligence and approaches intentional wrongdoing." *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998). In other words, "[d]eliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts." *Duckworth v. Ahmed*, 532 F.3d 675, 679 (7th Cir. 2008). "A jury can infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Id.* (quotation marks omitted). A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence

of professional judgment, that is, that "no minimally competent professional would have so responded under those circumstances." *Roe*, 631 F.3d at 857 (quotation marks omitted).

A prisoner, however, "need not prove that the prison officials intended, hoped for, or desired the harm that transpired." *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002); *see also Duckworth*, 532 F.3d at 679 ("[A]lthough deliberate means more than negligen[ce], it is something less than purposeful."). Nor does a prisoner need to show that he was literally ignored. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). That the prisoner received some treatment does not foreclose his deliberate indifference claim if the treatment received was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition." *Id.* (quotation marks omitted).

## A. Section 1915(e)(2) Screening of Complaint

Our review of a dismissal under § 1915(e)(2)(B) for failure to state a claim is de novo. *DeWalt v. Carter*, 224 F.3d 607, 611 (7th Cir. 2000). We apply the same standard used for evaluating dismissals under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "taking all well-pleaded allegations of the complaint as true and viewing them in the light most favorable to the plaintiff." *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010). To satisfy the notice-pleading standard of Rule 8 of the Federal Rules of Civil Procedure, a complaint must provide a "short and plain statement of the claim

showing that the pleader is entitled to relief," which is sufficient to provide the defendant with "fair notice" of the claim and its basis. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) and quoting Fed. R. Civ. P. 8(a)(2)). We must however construe pro se complaints liberally and hold them to a less stringent standard than formal pleadings drafted by lawyers. *Erickson*, 551 U.S. at 94 (citation omitted); *Obriecht v. Raemisch*, 517 F.3d 489, 491 n.2 (7th Cir. 2008).

Recent cases instruct us to examine whether the allegations in the complaint state a "plausible" claim for relief. *Iqbal*, 129 S. Ct. at 1949. To survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The complaint "must actually suggest that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs.*, 536 F.3d 663, 668 (7th Cir. 2008) (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008)). This doesn't impose a probability requirement on plaintiffs: "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. The complaint must instead call for "enough fact to raise a reasonable ex-

pectation that discovery will reveal evidence" supporting the plaintiff's allegations. *Id.*

Based on a review of Arnett's complaint and attached documents we have no trouble finding that he stated a claim against medical defendants, Dr. Wilson, Beighley, and Paul-Blanc, for violations under the Eighth Amendment. The defendants knew that Arnett had RA and was in continuous pain as a result of the inflammation in his joints; yet, they didn't provide him medication to treat his underlying condition, not Enbrel as he requested and Dr. Davis instructed, nor any other substitute medication. (In his appellate brief, Arnett describes Dr. Davis' comment as a "recommendation," but construing the facts in light most favorable to Arnett, we prefer to refer to it as an "instruction." After all, Dr. Davis is a RA specialist who Arnett specifically went to see for a consultation. When Dr. Davis said "I would like" for Arnett to resume a specific dosage of Enbrel once a week, that can reasonably be inferred to be an instruction.) Arnett was not provided effective treatment of his RA until October 2007, over ten months after he arrived at Terre Haute and first sought treatment. The summary judgment record indicates that Arnett was given pain medication, but he was reasonably seeking medication to treat, not simply mask, his condition.[5] Even though he informed prison officials that the

---

[5] The goal in treating RA "is to reduce inflammation as a means of preventing erosion and progressive deformity." *See The Merck*

(continued...)

pain medication was not working, they persisted in a course of treatment, according to Arnett's allegations, known to be ineffective. Arnett alleged that the defendants intentionally refused to provide him with Enbrel and their refusal to treat him caused him substantial pain and suffering, including irreversible physical damage and deformity of his joints. These facts are sufficient to state a claim.

It is not clear why the complaint was allowed to go forward against Dr. Webster but not the other medical

---

[5] (...continued)

*Manual of Diagnosis and Therapy* 283-89. Drug therapy for RA usually combines non-steroidal anti-inflammatory drugs (NSAIDs), which help reduce symptoms, and disease modifying antirheumatic drugs (DMARDs), which slow disease progression. *See id.* NSAIDs are used to control the symptoms and signs of the local inflammatory process, and DMARDS are used to modify the inflammatory component of RA and its destructive capacity. *See Harrison's Principles of Internal Medicine* 2089-90 (17th ed. 2008). Enbrel is a more recent type of drug that is aligned with DMARDS, but is classified as a "biological response modifier"; it is a TNF-neutralizing agent that has been shown to have a "major impact on the signs and symptoms of RA and also to slow progressive damage to articular structures." *See Harrison's Principles of Internal Medicine* 2090 (stating that TNF-neutralizing agents have been "shown to slow the rate of progression of joint damage . . . and to improve disability."). We express no opinion on the appropriate treatment for Arnett, but we cite these authoritative sources to illustrate commonly accepted treatment options for individuals with RA.

defendants. We are particularly curious about the district court's reasoning for dismissing Dr. Wilson, Arnett's primary care physician at the prison. Dr. Wilson was aware of Arnett's condition, his need for treatment, and his pleas for Enbrel. In fact, Dr. Davis wrote a letter addressed to Dr. Wilson in February 2007 instructing that Arnett be placed back on Enbrel. The letter explained the severity of Arnett's condition, the associated pain, and the need for treatment to prevent permanent joint damage. After receiving this letter, Dr. Wilson still did nothing to treat Arnett's RA with effective medication. As to Beighley and Paul-Blanc, Arnett asked them repeatedly for Enbrel, but they simply told him that the request had been submitted to the BOP and they were waiting for a response.

Arnett has a serious medical condition and his pleas for treatment and medication were ignored for over ten months while he suffered intense pain. It appears that a request for Enbrel was made to the BOP, but then languished. It is unclear who caused the delay or who was responsible for following-up with the request, but what we do know is that Arnett didn't receive an Enbrel injection until October 2007. Deliberate indifference can include the intentional delay in access to medical care. *Rodriguez*, 577 F.3d at 828. A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain. *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). "[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Id.*

*Compare id.* at 640-41 (delays in referring inmate to dentist, to oral surgeon, and ENT specialist over the course of several months while inmate continued to suffer significant pain and his condition deteriorated was sufficient to state a claim of deliberate indifference), and *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (guards could be liable for delaying treatment for painful broken nose by at least a day-and-a-half), with *Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1991) (dismissal for failure to state a claim proper because six-day wait to see a doctor was not unreasonably long for infected cyst deemed not that severe). Arnett's steady complaints of escalating pain indicate that the delay of ten months unreasonably prolonged his suffering. *See Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

Allegations of refusal to provide an inmate with pre-scribed medication or to follow the advice of a specialist can also state an Eighth Amendment claim. *See Wynn v. Southward*, 251 F.3d 588, 594 (7th Cir. 2001) (failure to respond to inmate's request for prescribed heart medica-tion); *see also Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999) (refusal to administer prescribed pain medication); *Jones v. Simek*, 193 F.3d 485, 490-91 (7th Cir. 1999) (failure to follow advice of specialists). Arnett had been prescribed Enbrel for his RA before his arrival at Terre Haute, repeatedly asked for the medication after his arrival, and obtained a letter from Dr. Davis informing Dr. Wilson to place him back on the medica-tion. Even if the prison couldn't get Enbrel because it wasn't on the formulary, medical personnel cannot stand idly by for more than ten months while Arnett's RA

progressively worsened and caused permanent damage to his joints;[6] they must explore alternative treatments that are available. *See, e.g.*, *Norfleet*, 439 F.3d at 395 (inmate treated by Dr. Webster received Naprosyn (a NSAID) for his RA).

Although the defendants provided him pain medicine, a medical professional's actions may reflect deliberate indifference if he "chooses an easier and less efficacious treatment without exercising professional judgment." *See McGowan*, 612 F.3d at 641 (quotation marks omitted); *see also Gil v. Reed*, 381 F.3d 649, 663 (7th Cir. 2004) (where outside doctor prescribed prisoner Vicodin, but it was not on the prison formulary, the prison doctor couldn't simply substitute with an ineffective alternative medication; he needed to consider other more effective substitutes); *Kelley v. McGinnis*, 899 F.2d 612, 616 (7th Cir. 1990) (complaint sufficient to state claim where plaintiff alleged that clinic personnel deliberately gave him certain kind of treatment knowing that it was ineffective). A prison physician cannot simply continue with a course of treatment that he knows is ineffective in treating the inmate's condition. *See Greeno*, 414 F.3d at 655.

---

[6] The defendants point out that Arnett didn't submit expert opinion testimony on the damaging effects of RA and treatment options, but Arnett did attach Dr. Davis' February 2007 letter and Dr. Bergquist's September 2007 letter to his complaint, and while we agree that expert opinion testimony may be necessary to survive summary judgment, it is not necessary at the pleading stage.

Arnett has an inflammatory condition, yet he was never provided anti-inflammatory medication, not even aspirin, a well-known and readily available NSAID. Arnett wasn't seeking an unconventional treatment; he sought medication that would reduce his pain and swelling and slow the progression of his RA. Although an inmate is not entitled to demand specific care and is not entitled to the best care possible, he is entitled to reasonable measures to meet a substantial risk of serious harm. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Arnett alleges that the medical defendants, despite their knowledge of his serious medical condition, ignored his request for effective treatment for over ten months. Arnett's allegations that the medical defendants knowingly ignored his complaints of pain by continuing with a course of treatment that was ineffective and less efficacious without exercising professional judgment are sufficient to state a claim. *See Berry*, 604 F.3d at 441-42 ("Where [inmate] made a modest request for treatment . . ., Dr. Butler's obdurate refusal to alter [inmate's] course of treatment despite his repeated reports that the medication was not working and his condition was getting worse, is sufficient to defeat her motion for summary judgment.") (internal citations and quotation marks omitted). At this stage, we cannot say that Arnett's allegations describe only simple negligence, as opposed to deliberate indifference to a worsening medical condition. *See, e.g.*, *Simek*, 193 F.3d at 490 (plaintiff stated a claim where prison doctor delayed arranging appointments for inmate to see specialists and then failed to follow the specialists' advice, during which time inmate's condition continued to worsen).

Maybe Arnett will be unable to support his factual allegations with admissible evidence. Maybe Beighley and Paul-Blanc properly relied on the advice of Dr. Wilson. Maybe Dr. Wilson can show that he legitimately explored alternative options and rejected them for valid reasons or that his treatment decisions were otherwise based on his medical judgment. These, and other questions, will need to be explored through discovery. Whether Arnett can support his allegations that the medical defendants were deliberately indifferent remains to be seen. The district court was too hasty in dismissing his claims against the medical defendants, especially given its duty to construe pro se complaints liberally. *See McGowan,* 612 F.3d at 640 (inmate stated a claim where he set forth a "plausible account of the facts showing how much delay he experienced, how often he and others asked [the defendant] to act, and what the consequences were of inaction."). We do not make any determination about the ultimate merits of the allegations contained in the complaint, nor should our decision today be read as suggesting an ultimate outcome. We only conclude that Arnett has stated a claim "plausible on its face" that the medical defendants acted with deliberate indifference to his serious medical condition in violation of the Eighth Amendment.

We come to a different conclusion with respect to the non-medical defendants, Warden Veach and Case Manager Parker. Arnett conceded at oral argument that Veach was properly dismissed, so we limit our discussion to Parker. Arnett didn't go so far as to say that Parker was properly dismissed, but he did concede that Parker

was in a similar situation to Veach. We agree. Arnett's allegations against Parker are minimal. He alleges that starting in May 2007, he went to Parker two to three times a week and requested that he be placed back on Enbrel. In response, Parker merely said, "Go talk to Blanc." Parker cannot be held liable on the basis of respondeat superior; to be liable, he must be personally liable for Arnett's injury. *See Iqbal,* 129 S. Ct. at 1948; *see also Vance v. Rumsfeld*, Nos. 10-1687 & 10-2442, 2011 WL 3437511, *6 (7th Cir. Aug. 8, 2011).

Non-medical defendants, such as Parker, can rely on the expertise of medical personnel. We have previously stated that if a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. *Greeno*, 414 F.3d at 656. We find the following passage from *Spruill v. Gills*, 372 F.3d 218, 236 (3d Cir. 2004), particularly instructive here:

> [I]f a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor.

*See also Greeno*, 414 F.3d at 656 (adopting reasoning in *Spruill*). However, "nonmedical officials can 'be chargeable

with . . . deliberate indifference' where they have 'a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner.'" *Hayes v. Snyder*, 546 F.3d 516, 525 (7th Cir. 2008) (quoting *Spruill*, 372 F.3d at 236). Non-medical defendants cannot simply ignore an inmate's plight. *See Greeno*, 414 F.3d at 656 (stating that "[p]erhaps it would be a different matter if [the non-medical defendant] had ignored Greeno's complaints entirely, but we can see no deliberate indifference given that he investigated the complaints and referred them to the medical providers who could be expected to address Greeno's concerns."); *see also Berry*, 604 F.3d at 440 ("As a nonmedical administrator, [defendant] was entitled to defer to the judgment of jail health professionals so long as he did not ignore [the inmate]."). However, mere negligence in failing to detect and prevent subordinates' misconduct is not sufficient. *See Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996). The plaintiff must demonstrate that "the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to 'an excessive risk to inmate health or safety.'" *Id.* (quoting *Farmers v. Brennan*, 511 U.S. 825, 837 (1979)). Once an official is alerted of such a risk, the "refusal or declination to exercise the authority of his or her office may reflect deliberate disregard." *Id.*

The allegations in Arnett's complaint are insufficient to state a claim that Parker acted with deliberate indifference in referring Arnett to medical personnel who were treating Arnett on a regular basis. This is not a case where Arnett was being completely ignored by medical

staff. Although Parker was aware, based on Arnett's complaints, that he wasn't receiving the specific medication he sought, Arnett doesn't allege that Parker condoned or approved the medical staff's alleged refusal to provide him medical care, impeded their ability to provide effective treatment, or was in a position to take corrective action. Parker was able to relegate to the prison's medical staff the provision of good medical care. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("[Inmate's] contention that any public employee who knows (or should know) about a wrong must do something to fix it is just an effort to evade, by indirection, *Monell*'s rule that public employees are responsible for their own misdeeds but not for anyone else's."). "A layperson's failure to tell the medical staff how to do its job cannot be called deliberate indifference; it is just a form of failing to supply a gratuitous rescue service." *Id.* Arnett's allegations against Parker are simply too meager to state a claim of deliberate indifference against a non-medical defendant who referred Arnett to his treating physician's assistant.

Maybe Arnett could have corrected the deficiencies in his complaint against Parker. Although the district court's dismissal of Parker doesn't indicate if it was with or without prejudice, generally, an involuntary dismissal operates as an adjudication on the merits if not otherwise indicated. *See* Fed. R. Civ. P. 41(b). But given Arnett's pro se status and the fact that he may have been able to cure the deficiencies in his claim against Parker, the dismissal should have been without prejudice with leave to amend. *See Glandey v. Pendleton Corr. Facility*, 302

F.3d 773, 775 (7th Cir. 2002) (claims dismissed pursuant to § 1915(e) generally should be allowed to proceed if plaintiff pays filing fee); *see also Vance,* 2011 WL 3437511, at *14 n.7 ("A reversal for inadequate pleading would require an opportunity to cure the defect unless it were clear that the defect could not be cured."); *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 778 (7th Cir. 2007) (failure to provide notice under Fed. R. Civ. P. 8 "should not normally warrant dismissal *with prejudice*"); *Donald v. Cook Cnty. Sheriff's Dep't*, 95 F.3d 548, 555 (7th Cir. 1996) ("[D]istrict courts have a special responsibility to construe pro se complaints liberally and to allow ample opportunity for amending the complaint when it appears that by so doing the pro se litigant would be able to state a meritorious claim.").

Arnett, however, never sought to amend his complaint or re-file upon paying the filing fee and the district court was not required to inform him that he *should.* "District judges have no obligation to act as counsel or paralegal to *pro se* litigants." *Myles v. United States*, 416 F.3d 551, 552 (7th Cir. 2005) (quotation marks omitted) (noting that plaintiff could have amended the complaint pursuant to Rule 15(a) of the Federal Rules of Civil Procedure after the district judge dismissed it pursuant to 28 U.S.C. § 1915A, but he didn't seek to amend, and the judge had no obligation to inform plaintiff that he should). "Fomenting litigation is not part of the judicial function," *id*, and "district judges are not required to solicit more litigation spontaneously," *Burks*, 555 F.3d at 596. Because Arnett hasn't suggested any way he might have amended his complaint to state a claim

against Parker, we affirm the district court's dismissal of him. *See Leavell v. Ill. Dep't of Natural Res.*, 600 F.3d 798, 808 (7th Cir. 2010) (finding that dismissal with prejudice was warranted where plaintiff didn't explain how she could amend her complaint to state a claim).

## B.  Summary Judgment as to Dr. Webster

We review a district court's grant of summary judgment de novo, construing all facts and reasonable inferences in the light most favorable to the non-moving party. *Spivey v. Adaptive Mktg. LLC*, 622 F.3d 816, 822 (7th Cir. 2010). Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

As we indicated above, a defendant cannot be liable under *Bivens* on the basis of respondeat superior or supervisory liability, rather, there must be individual participation and involvement by the defendant. *See Iqbal*, 129 S. Ct. at 1948-49; *see also Vance*, 2011 WL 3437511, at *6. "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 129 S. Ct. at 1949. As such, Dr. Webster cannot be held liable merely due to his supervisory capacity as clinical director.[7] The test for

---

[7]  As clinical director, Dr. Webster presumably had supervisory authority over Dr. Wilson. *See Norfleet*, 439 F.3d at 394 (stating

(continued...)

establishing personal responsibility was set forth in
*Gentry v. Duckworth,* 65 F.3d 555, 561 (7th Cir. 1995):

> Of course, [the defendant prison official] cannot be
> personally liable under a theory of *respondeat superior*.
> However, an official satisfies the personal responsibil-
> ity requirement of section 1983 if the conduct
> causing the constitutional deprivation occurs at his
> direction or with his knowledge and consent. That
> is, he must know about the conduct and facilitate it,
> approve it, condone it, or turn a blind eye. In short,
> some causal connection or affirmative link between
> the action complained about and the official sued is
> necessary for § 1983 recovery.

*Id.* (internal citations, quotation marks, brackets, and
ellipses omitted); s*ee also Chavez v. Ill. State Police*, 251
F.3d 612, 651 (7th Cir. 2001). The Supreme Court recently
stated that "purpose rather than knowledge is required
to impose *Bivens* liability." *Iqbal*, 129 S. Ct. at 1949. Al-
though *Iqbal* was a discrimination case involving dis-
criminatory purpose, the Court's reasoning in that case
has raised questions about whether a stricter standard
of personal liability for supervisors applies in delib-
erate indifference suits. We recently indicated that "mere
'knowledge and acquiescence' is not sufficient to impose"
such liability, but that "*Iqbal* did not disturb the . . . princi-

---

[7] (...continued)
that Dr. Webster, as clinical director, was "in charge of the
medical care and treatment of all inmates."). We say presumably
because this is not clear from the record.

ples holding that a supervisor may be liable as an individual for wrongs he personally directed or authorized his subordinates to inflict," *Vance*, 2011 WL 3437511, at *6 & n.5; *see also Starr v. Baca*, No. 09-55233, 2011 WL 2988827, at *4 (9th Cir. July 25, 2011) ("We see nothing in *Iqbal* indicating that the Supreme Court intended to overturn longstanding case law on deliberate indifference claims against supervisors in conditions of confinement cases."). The landscape of such claims after *Iqbal* remains murky, but we need not clear the waters here because the record doesn't show that Dr. Webster was personally involved in the alleged constitutional violations under the standard set forth in *Gentry*.

Dr. Webster examined Arnett on two occasions in November 2006 at which time, Arnett informed him of his RA and need for Enbrel. Enbrel wasn't on the prison's formulary, so before Arnett could receive it, Dr. Webster would have had to request authorization from the BOP. Dr. Webster put in a non-formulary request for Gabapentin—a pain medication that Arnett had been taking before his arrival at Terre Haute—and continued Arnett on Gabapentin temporarily pending a decision on the non-formulary request. Dr. Webster didn't similarly put in a request for Enbrel or continue Arnett on Enbrel temporarily. (Webster contends that's because he wasn't aware that Arnett had previously been prescribed Enbrel.) However, Dr. Webster did take further steps to treat Arnett: he issued him a bottom bunk pass (presumably because of his joint pain), prescribed pain medication, ordered x-rays, and submitted approval for consultation with a rheumatologist. Arnett's medical

records indicate that he needed a consultation with an outside rheumatologist before receiving Enbrel. Arnett was seen by Dr. Davis in February 2007, during which time, Dr. Wilson was his primary care physician. Arnett's last interaction with Dr. Webster was a few weeks after his appointment with Dr. Davis when he asked Dr. Webster for Enbrel pursuant to Dr. Davis' instructions. Dr. Webster responded, "We're working on it." At this time, Dr. Webster's involvement with Arnett's care was a passing conversation in the medical unit.[8]

This record doesn't allow for a reasonable jury to infer that Dr. Webster acted with deliberate indifference. It seems Dr. Webster may have thought a request for Enbrel had been submitted and prison medical staff were waiting for a response from the BOP after Arnett's appointment with the rheumatologist. Dr. Webster failed

---

[8] Dr. Webster's name does appear on Arnett's medical charts dated March 19 and April 14, which indicated that Arnett's pain medications were renewed. Also on July 9, the entry that indicates Arnett was to receive Enbrel, but hadn't because the prison never heard back from the non-formulary request, indicates that labs had been requested by Dr. Webster. On July 11, Dr. Webster further signed a record of medical care stating that the utilization review committee approved a follow-up appointment with Dr. Davis to consult for RA. Arnett doesn't indicate that he saw Dr. Webster on any of these occasions or discussed his condition with Dr. Webster and there is no evidence (other than Dr. Webster's name appearing on these documents) that he was personally involved in Arnett's care on such dates.

to investigate further when Arnett informed him he still had not received the medication in February 2007. Given Arnett's condition and repeated pleas for Enbrel, Dr. Webster should have investigated further. Although his failure to do so may amount to negligence, the summary judgment record does not lead to the conclusion that it rose to the level of deliberate indifference. "Deliberate indifference is not medical malpractice; the Eighth Amendment doesn't codify common law torts." *See Duckworth*, 532 F.3d at 679. Arnett's communication to Dr. Webster was simply not sufficient, without additional evidence, to show that he failed to act despite knowledge of a substantial risk of serious harm to Arnett. *See Vance*, 97 F.3d at 993-94.

Dr. Webster provided treatment to Arnett when he first arrived at the Terre Haute facility. It may not have been the most appropriate treatment, but a prisoner is only entitled to reasonable measures to meet a substantial risk of serious harm. *Forbes*, 112 F.3d at 267. During Dr. Webster's brief care of Arnett, his treatment wasn't so far afield of accepted professional standards as to raise the inference that it was not actually based on medical judgment. *See Duckworth*, 532 F.3d at 679; *cf. Gil*, 381 F.3d at 663 & n.3 (finding deliberate indifference where the prison doctor prescribed a drug that worsened inmate's condition because the appropriate drug was not part of the BOP's formulary); *Greeno*, 414 F.3d at 654 (finding deliberate indifference where medical defendants would not alter Greeno's course of treatment over a two year period even though his condition was getting worse and he was vomiting on a

regular basis and the defendants nevertheless persisted in a course of treatment known to be ineffective). Dr. Webster took measures to address Arnett's pain, and although prescribing pain medication may not have been effective in treating Arnett's RA, the summary judgment record doesn't reveal that no minimally competent professional would have provided this regime of treatment in the short term, at least until Arnett could be seen by a rheumatologist. *See, e.g., Gayton v. McCoy*, 593 F.3d 610, 622-23 (7th Cir. 2010) (nurse wasn't deliberately indifferent to inmate's medical needs where she took reasonable measures to ensure that inmate would get medication). Without some evidence, such as expert opinion testimony, creating a reasonable inference that Dr. Webster's treatment during this time frame was so inadequate that it demonstrated an absence of professional judgment, Arnett cannot succeed against him on summary judgment. Dr. Wilson took over as Arnett's primary care physician on December 28, and he was Arnett's treating physician when Dr. Davis instructed that Arnett be placed back on Enbrel. Arnett's complaints are more appropriately directed toward Dr. Wilson.

Arnett also hasn't presented facts showing that Dr. Webster was aware that the continued treatment Arnett received for his RA was ineffective. Arnett offers no evidence that Dr. Webster directly oversaw or approved Dr. Wilson's individualized treatment decisions or in any way impeded Dr. Wilson's ability to effectively treat Arnett. Nor is there evidence that Dr. Webster examined Arnett or reviewed his chart after November 2006 or was

otherwise involved with Dr. Wilson's medical decisions as to Arnett's treatment regime. *Compare Minix v. Canarecci*, 597 F.3d 824, 834 (7th Cir. 2010) (affirming grant of summary judgment in favor of director of medical services at jail because missing from the record was "evidence suggesting that [he] was aware that [nurses were] performing incompetent assessments of suicidal inmates but nevertheless acquiesced in that practice"), *with Ortiz v. Webster*, No. 10-2012, 2011 WL 3691437 (7th Cir. Aug. 24, 2011) (reversing summary judgment in favor of Dr. Webster where he was personally involved in inmate's care and the evidence showed that he substantially and unreasonably delayed necessary treatment) and *Hayes*, 546 F.3d at 524-26 (reversing summary judgment in favor of the defendant where he continued to monitor the inmate's treatment after the initial in-person examinations).

There must be a causal connection or affirmative link between the action complained about and the official sued and that connection is missing with respect to Dr. Webster. This isn't a case where Dr. Webster simply walked away from the situation and left Arnett without medical care. A review of Arnett's prison medical records indicates that he was being seen regularly by medical staff, his pain medications were being renewed, x-rays were performed, and he was examined by an outside rheumatologist and an orthopedic surgeon. Dr. Webster left Arnett in the care of other medical personnel, including a staff physician. Whether the care he received was so far afield of accepted professional standards as to raise the inference that it was not actually

based on medical judgment remains to be seen. But the defendants whose medical judgment is properly being questioned is Dr. Wilson's, and possibly Beighley's and Paul-Blanc's depending on their involvement in Arnett's treatment—individuals who continued to see Arnett on a regular basis after Dr. Davis instructed that he be placed back on Enbrel.

Arnett had the burden to come forth with evidence to show that Dr. Webster was personally liable for his alleged inadequate medical treatment after December 2006, and he has failed to do so. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) ("[S]ummary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.") (quotation marks omitted). We realize that this may be the result of Arnett's pro se status and lack of legal skills in conducting discovery, but Arnett's pro se status doesn't alleviate his burden on summary judgment. *See Marion v. Radtke*, 641 F.3d 874, 876-77 (7th Cir. 2011) ("[W]hen a plaintiff fails to produce evidence, the defendant is entitled to judgment; a defendant moving for summary judgment need not produce evidence of its own.").

### III. Conclusion

For the foregoing reasons, we AFFIRM dismissal of Richard Veach and David Parker for failure to state a claim, AFFIRM the grant of summary judgment in favor of Dr. Thomas Webster, but REVERSE dismissal of

Dr. Eric Wilson, Yves Paul-Blanc, and Julia Beighley, and
REMAND for further proceedings.