POSNER, Circuit Judge,
dissenting.
In November 2006 William Miller was convicted of bank robbery and sentenced to 120 months in prison. Between then and his imprisonment, which began thirteen months later in the Federal Correctional Complex in Terre Haute, Indiana (“FCC Terre Haute” as the prison is more commonly known), he was diagnosed with a thalamic brain tumor (more commonly referred to in the medical profession as a thalamic glioma) that impaired the feeling in the' left side of his body — a typical symptom of the disease.
A month after entering prison, Miller was given a “lower-bunk restriction”: his doctor ordered that he be assigned to a lower bunk because of his medical condition, and a notation to that effect was added (or should have been added) to his profile in the prison’s electronic record-keeping system. A year later, for unknown reasons (but there is no indication that the reasons were disciplinary), he was assigned to a more restrictive housing unit in the prison than he’d originally been in, called the Special Housing Unit. He was initially given a lower bunk, but within hours was moved to an upper one. He complained to Gary Rogers, the number one guard in the unit, that because of his brain tumor he had a lower-bunk restriction, but Rogers told him he wouldn’t be switched to a lower bunk and if he refused the upper bunk he would “receive a disciplinary report for refusing a direct order.”
Yet just five days after this contretemps, climbing down the,ladder from his upper bunk Miller became dizzy, slipped, and fell to the concrete floor, hitting his head , and losing consciousness. According to the prison’s report of the incident, Miller was found “lying in [on?] [the] floor of [his] cell at [the] bottom of [the] bunk stairs” with “blood noted to [at?] top of head with a small ... laceration.” He was taken to a hospital, treated, and given a CAT scan, but upon his return to the prison was again assigned an upper bunk. He complained about the assignment, without effect, both to Rogers and to an attending nurse.
At about this time the prison’s warden, defendant Marberry, on one of her weekly walks through the Special Housing Unit, stopped at the door to Miller’s cell, and he told her he’d recently fallen from the upper bunk and should be placed in a lower bunk. As warden she could of course have taken up the issue of lower versus upper bunk for Miller with the prison’s medical staff, but she didn’t; she merely “walked away from [Miller’s] cell door leaving him in midspeech” (according to the complaint) — and this despite the fact that before he entered the Special Housing Unit, Miller had repeatedly discussed his brain tumor with the warden on her visits to prisoners during their lunch period.
*430 The following month (February 2009) Miller while sleeping fell from his upper bunk at about 2:30 a.m. and remained lying on the floor for an hour or two until noticed by staff, who placed him on a back board with a cervical collar around his neck and took him to the emergency room of a nearby hospital, where a CAT scan revealed that Miller had severely compacted (that is, compressed) the cervical segment of his spine and sustained a fracture in the thoracic region. He was placed in a hard clamshell back brace.
Upon his return to the prison so accoutered, he again requested a lower-bunk assignment and it was again refused without reasons given. Warden Marberry walked through the Special Housing Unit many times in 2009 and saw Miller lying on the upper bunk in his cell wearing his clam-shell back brace and a cervical brace. Each time she approached his cell he asked her for a lower bunk, but she did nothing in response to his request; and Rogers, who in making his rounds also saw Miller frequently, also did nothing. Throughout this period Miller was in acute pain.
Finally on December 1, 2009, Miller was given a new lower-bunk restriction for one year. Eleven days later, however, the day after a nurse removed surgical staples in Miller’s back that had been placed there during his most recent surgery, the wound that had been stapled burst open, discharging a large amount of a yellowish fluid consisting mainly of blood. He was taken to a hospital and remained there for four months until the wound healed. It appears that after returning from the hospital Miller was at last given a lower-bunk assignment.
Miller filed an administrative complaint with the prison the following year, complaining about all the time he’d been made to sleep in an upper bunk despite its serious consequences for his health. His complaint was denied on the ground that— although he’d had a lower-bunk restriction since January 29, 2008 — he had never submitted a document confirming that restriction to a member of the prison’s staff, as required by a notice to the prisoners that “It is your responsibility to have all medical restrictions on your person to present to staff.” Although he’d had a lower-bunk restriction since January 29, 2008, he had lost the document confirming the restriction and had been unable to obtain a new one from the prison’s medical staff until well into the following year.
He continued complaining about having to sleep in an upper bunk, all to no avail, and culminating in this remarkable brushoff by the Federal Bureau of Prisons Office of Regional Counsel: an “investigation of your claim did not reveal you suffered any personal injury as a result of the negligent acts or omissions of Bureau of Prisons employees acting within the scope of their employment.” In fact he had suffered severe injuries as a result of the negligence — indeed the deliberate indifference — of Rogers and Marberry, both of whom were aware of his problems, could not have failed to realize that they had resulted from his being sentenced to an upper bunk, and could readily have alerted the prison’s medical and administrative staff to the need to give him a lower bunk. They did nothing. That’s what’s called deliberate (that is, knowing) indifference to a serious medical need.
Judge Easterbrook’s majority opinion speculates that medical personnel might issue lower-bunk restrictions for reasons that don’t imply the existence of a serious medical need; points out that not all brain tumors are serious; and reminds the reader that guards are not obliged to believe whatever a prisoner tells them. All true— but whether Rogers or Marberry was aware of the serious health risk to Miller *431 from being assigned to an upper bunk is an open question that needs to be addressed at a trial. The record contains facts that support Miller’s claim that he had a serious medical need and that the defendants knew it and did nothing despite their responsibilities.
His administrative claims denied, Miller brought this civil suit pro se against Rogers, Marberry, and a nurse named Haddix (whom we can ignore however because there is no evidence that she neglected any of Miller’s needs), charging them with deliberate indifference to his medical problems in violation of the Eighth Amendment. The district judge granted summary judgment in favor of the defendants, however, mainly on the basis of the defendants’ claim that Miller was not listed in the prison’s electronic database as having a lower-bunk restriction. This as I’ll show is almost certainly incorrect.
He appealed to our court, again pro se, but while the appeal was pending the court recruited counsel for Miller and struck all the briefs that had been filed thus far with the court. Four months later Miller died, causes unknown — so far as appears no autopsy, was performed. Miller’s lawyer was permitted to substitute Miller’s estate as the appellant, and the appeal was argued to this panel on November 29 of last year.
Now it’s true that Rogers and Marber-ry, not being medical personnel, were entitled to “rely on the expertise of medical personnel,” Arnett v. Webster, 658 F.3d 742, 755 (7th Cir. 2011), but nonmedical prison personnel “cannot [be permitted to] simply ignore an inmate’s plight” of which they’re aware, id. — which a jury could well find was what happened in this case. The defendants knew after Miller’s first fall from an upper bunk, and from his complaints to both of them, that he was in danger of a serious injury if he remained in an upper bunk, and it would been the simplest thing in the world for either or both of them to have conveyed his complaints to the prison’s medical staff for confirmation of whether he already had, and if not should be given, a lower-bunk restriction.
Warden Marberry’s reactions to Miller’s complaints made to her repeatedly in person as she made her rounds through the Special Housing Unit were grossly insensitive — so callous that they could have been expected to cost her her job. All she would have had to do in response to Miller’s complaints was alert the prison’s medical staff to them; the staff would have responded with alacrity to a directive by the warden to determine whether Miller should be given (or indeed already had, as indeed he did have after January 2008) a lower-bunk restriction. It would have taken her no time, no effort, and no detailed knowledge of Miller’s condition to respond intelligently to his repeated and plausible complaints (plausible given his brain tumor and his falls from the upper bunk). After his first fall, and certainly after his second, it must have been obvious to Marberry and Rogers and any other prison personnel who knew of Miller’s condition that he should not be consigned to an upper bunk.
And finally we know that Miller had been given a lower-bunk restriction in January 2008, before both of his falls from his upper bunk, which occurred early the following year; he just didn’t have a paper copy of it and so couldn’t prove to Rogers’ satisfaction that he had such a restriction. Warden Marberry confirmed in writing that Miller had been given the restriction then and that it was recorded in the prison’s database. As a defendant’s statement against interest, that confirmation was sufficient to create a factual dispute that could not be resolved by the district judge on summary judgment. The contrary evidence was in fact weak, for remember that *432 it was the warden who said that Miller had had a lower-bunk restriction since January 2008; and Rogers testified weakly that “it would have been” his practice to rely on the number two officer in the Special Housing Unit to check the database if an inmate complained that he had a bunk restriction that wasn’t being honored. And more weakly still: “I vaguely remember this inmate [Miller] and do not specifically recall what his medical issues were or may have been on January 6, 2009.”
Marberry also pleaded forgetfulness. She claimed no recollection of what if anything she’d done in response to Miller’s repeated complaints about being denied a lower bunk. (Obviously, nothing.) No defendant has argued that all the lower bunks were filled by inmates who, like Miller, could not be safely assigned to upper bunks, so that there was no room for him. Most important, there is no evidence that anyone checked the database to see whether, as Miller repeatedly said, he had a lower-bunk restriction.
The insouciance of Rogers and Marber-ry is remarkable, as well as deplorable, when one recalls that both knew about Miller’s brain tumor, about his wanting a lower bunk for medical reasons, and about at least his first fall from the upper bunk and his resulting hospitalization. (Almost certainly they knew of the second fall as well.) True, Rogers is just a guard, but as we said in Dobbey v. Mitchell-Lawshea, 806 F.3d 938, 941 (7th Cir. 2015), “prison guards have a responsibility for prisoners’ welfare. If a prisoner is writhing in agony, the guard cannot ignore him on the ground of not being .a doctor; he has to make an effort to find a doctor, or in this case a dentist, or a technician, or a pharmacist— some medical professional.” See also Smego v. Mitchell, 723 F.3d 752, 767 (7th Cir. 2013). If that’s true of a mere guard, it is a fortiori true of a warden who knows that a prisoner’s potentially very dangerous health condition is being ignored by the prison’s guards and medical staff that she — the warden — supervises.
I note that the Bureau of Prisons is required by law to “provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States....” 18 U.S.C. § 4042(a)(2). The Bureau failed in this case. Quarters with an upper-bunk assignment are not suitable for someone with the kind of brain tumor that Miller had; he was denied both safekeeping and care. This is a classic case of turning a blind eye to “a substantial risk of serious harm to a prisoner.” Perez v. Fenoglio, 792 F.3d 768, 781 (7th Cir. 2015).
Judge Easterbrook’s opinion cites Ashcroft v. Iqbal, 556 U.S. 662, 677, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), for its rejection of a theory of “supervisory liability” that would make supervisors liable for “knowledge and acquiescence in their subordinates’ use of discriminatory criteria to make classification decisions among detainees.” The Court in Iqbal thus rejected the proposition that a supervisor’s mere knowledge of a subordinate’s discriminatory purpose amounts to the supervisor’s violating the Constitution. ‘‘[Petitioners may not be held accountable for the misdeeds of their agents.... Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct. In the context of determining whether there is a violation of a clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose ... liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities.” Id.
*433 I have no quarrel with that. But knowledge and duty can be entwined. “A prison official’s knowledge of prison conditions learned from an inmate’s communications can, under some circumstances, constitute sufficient knowledge of the conditions to require the officer to exercise his or her authority and to take the needed action to investigate and, if necessary, to rectify the offending condition.” Vance v. Peters, 97 F.3d 987, 993 (7th Cir. 1996). Both Rogers and Marberry .were responsible for the safety of prison inmates and were on notice that Miller’s safety was jeopardized as a consequence of confining him to an upper bunk. They were complicit in his suffering and may have hastened his death.
A dog would have deserved better treat-. ment.
We should reverse.