In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 19-3009

ANTHONY J. MACHICOTE,

*Plaintiff-Appellant,*

*v.*

DOCTOR ROETHLISBERGER,
n/k/a Dr. Marie Herweijer, *et al.,*

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:18-cv-249 — **Barbara B. Crabb**, *Judge.*

———————————

SUBMITTED JULY 23, 2020[*] — DECIDED AUGUST 14, 2020

———————————

Before RIPPLE, HAMILTON, and SCUDDER, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Anthony Machicote is a Wisconsin inmate who had a surgery that left him in extreme pain

———————————

[*] We have agreed to decide this case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

necessitating strong medication at regular intervals. He faced
delays and interruptions in receiving those drugs and experi-
enced significant pain as a result. That led him to invoke 42
U.S.C. § 1983 and file a lawsuit against several physicians, a
health services manager, and a nurse who worked at the New
Lisbon Correctional Institution. The district court entered
summary judgment for all defendants, concluding that Ma-
chicote had not shown that any of them were deliberately in-
different to his suffering. We agree with respect to most of the
defendants and affirm the judgments in their favor. But Ma-
chicote has persuaded us that a factual issue remains as to the
deliberate indifference of the nurse. We therefore vacate the
judgment as to only that defendant and remand for a trial.

## I

## A

Anthony Machicote underwent surgery to remove dam-
aged bone, tissue, and cartilage in his left ankle after he suf-
fered an injury while playing basketball in the New Lisbon
prison yard. The case at hand concerns his treatment upon re-
turn to the prison, the facts of which we recount in the light
most favorable to him. See *Hackett v. City of South Bend*, 956
F.3d 504, 507 (7th Cir. 2020).

After the procedure, the surgeon supplied Machicote with
oxycodone and warned that he would be in "extreme pain"
when the medication wore off. He was discharged with in-
structions recommending narcotic-strength painkillers every
six hours. Back at the prison, Dr. Marie Herweijer and Nurse
Kimberly Stecker reviewed Machicote's discharge instruc-
tions. For her part, Dr. Herweijer ordered Tylenol #3, a

combination of acetaminophen and codeine, for Machicote to take as needed every six hours for three days.

Nurse Stecker directed Machicote to take his first dose of Tylenol #3 at 9:30 p.m. that evening, fewer than six hours after he received the oxycodone following surgery. He refused at first, worried that taking the medication so early meant it would wear off during the night. In doing so, Machicote reminded Nurse Stecker not only of Dr. Herweijer's six-hour dosage instruction, but also the surgeon's warnings about the pain that would ensue once the effects of the oxycodone wore off. Nurse Stecker reacted by saying she "did not care" and telling Machicote he would have to "deal with the pain" because more medication would not be available until the next morning. Faced with no alternative, Machicote relented and took the pills.

Machicote's worry came true, for he found himself awake at 3:30 a.m. in "excruciating pain." He attempted to dull the pain with weaker medication, but it did not help. He passed the remaining hours of the night awake in agony until Nurse Stecker returned with more Tylenol #3 at around 6:20 a.m.

The following day, Machicote continued to have trouble accessing the medication that Dr. Herweijer had ordered for him. He went to the health services unit at around noon for his next dose of Tylenol #3, and Nurse Stecker told him to come back later and stand in the regular medication line. The prison has medication distribution scheduled for roughly 6 a.m., 12 p.m., 4 p.m., and 8 p.m. daily—a timetable that did not match the one in Machicote's prescription. When Machicote reminded Nurse Stecker of the prescribed dosage schedule, she retorted, "We will see about that!" but then gave him the pills he sought.

About an hour after that exchange, Machicote saw Nurse Stecker angrily gesturing toward him while arguing with Candace Warner, the prison's health services manager. The nurse then contacted the on-call doctor, Dr. Prapti Kuber, who revised Machicote's medication order from every six hours to four times daily to bring his dosage schedule in line with the prison's ordinary distribution hours. Warner told Machicote about the change, and he protested that it would result in him experiencing substantial pain overnight for even longer than before. She told him, "That's how it will go."

Machicote met further difficulty in his first attempts to conform to the new medication schedule. He stood in the prison's afternoon medication line only to be rejected by Nurse Stecker because it was "too early." He explained to her that his previous dose would soon wear off and that he was trying to comply with the new order, but she replied that it was "[n]ot [her] problem." A friend of his called the prison later that day out of concern that Machicote's pain was not being managed adequately, but Nurse Stecker rebuffed the friend's plea.

For the next three days, Machicote received his medication during the prison's regular distribution hours as Dr. Kuber had ordered, and each night he laid awake in "excruciating pain." His friends called the New Lisbon staff to tell them of his suffering to no avail.

Then Machicote's medication order ran out completely, and he began experiencing agonizing ankle pain around the clock. He filed a health services request, complaining of a fever, an "extreme burning" pain around his ankle and foot, and a wet feeling in his bandages. Nurse Stecker changed his bandages but refused to contact a doctor. Two days later,

Machicote complained of "unbearable pain" to a shift sergeant, who placed an emergency call to health services on his behalf. It took yet another health services request and a voicemail from his friend to Warner before Machicote was finally seen by a nurse the next day. The nurse noted that Machicote appeared sleepless and distraught and said she would consult with a doctor.

Five days after Machicote's initial medication order expired, supervising physician Dr. Karl Hoffman prescribed him another painkiller, Tramadol, to take every six hours as needed for four weeks. Machicote did not receive the medication for two more days, and his medical records show that the pain required management for several more weeks.

B

Without the assistance of an attorney, Machicote sued Dr. Herweijer, Dr. Kuber, Dr. Hoffman, Warner, and Nurse Stecker under 42 U.S.C. § 1983, claiming that they were deliberately indifferent to his post-surgery pain in violation of the Eighth Amendment. He alleged that the pain medication prescriptions from Dr. Herweijer and Dr. Kuber were inadequate; that Nurse Stecker deliberately ignored his pain and interfered with his treatment; that Warner as the health services manager should have reevaluated his medication schedule after he continued to complain; and that Dr. Hoffman—as a supervising physician who knew about his surgery—should have monitored his condition and ordered medical staff to follow a better dosing schedule.

The district court denied Machicote's request that a lawyer be recruited to represent him, explaining that he first needed to try to find an attorney on his own. Further, the court

reasoned, at the pleadings stage he needed only to state "what happened, when, where and who was involved," a task that did not require a lawyer's help given that Machicote's filings were legible and coherent.

The defendants eventually moved for summary judgment, and they were successful. The district court concluded that Machicote had not come forward with evidence to show that any of the defendants who had been personally involved in his treatment were deliberately indifferent to his suffering. Having resolved all of the claims, the district court entered judgment in favor of the defendants.

Machicote, still without a lawyer, now appeals the district court's grant of summary judgment and the denial of his request for recruited counsel.

## II

Summary judgment is proper only if the defendants show that no material facts are in genuine dispute and that they are entitled to judgment as a matter of law. See FED. R. CIV. P. 56(a). A genuine dispute over a material fact exists if "the evidence is such that a reasonable jury could return a verdict" for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We review the district court's grant of summary judgment *de novo*, drawing all reasonable inferences in Machicote's favor. See *Hackett*, 956 F.3d at 507.

Machicote's claims arise under the Eighth Amendment, which prohibits deliberate indifference to the serious medical needs of prisoners. See *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The defendants do not dispute that his post-surgery pain was objectively serious, so the question is whether Machicote put forth evidence from which a jury could find that

the defendants actually knew about the pain and recklessly disregarded or needlessly prolonged it. See *id*. at 104–06; *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011).

A

We begin with Machicote's claim against Nurse Stecker. The district court concluded that the record contained no suggestion that she knew the severity of Machicote's pain or that the actions she took (or did not take) would prolong it. For his part, Machicote points us to a combination of events that he contends demonstrate more than a negligent mistake and would allow a reasonable jury to find deliberate indifference. We agree with him, persuaded by evidence of three episodes that could combine to convince a jury.

*First*, Nurse Stecker knowingly defied Dr. Herweijer's medication order. The very first night after Machicote returned from surgery, the doctor directed that he receive Tylenol #3 every six hours as recommended in the hospital's discharge instructions. Yet Nurse Stecker forced him to take the pills ahead of schedule, even though he told her about his surgeon's warning that he would suffer extreme pain when the medication wore off. Machicote's concern prompted nothing more than a shoulder shrug—she responded by saying she "did not care" and that he would have to "deal with the pain." Delaying necessary medication for hours of needless suffering can be sufficient for a jury to infer deliberate indifference. See *Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004) (concluding that facts showing physician's assistant denied prescribed medication could permit a jury to infer knowledge of risk of harm); *Walker v. Benjamin*, 293 F.3d 1030, 1040–41 (7th Cir. 2002) (denying inmate pain medication as ordered by a doctor

could support inference that nurse recklessly ignored his pain).

*Second*, a jury could reasonably infer that Nurse Stecker had Machicote's dosage schedule changed simply because she did not want to administer the medication every six hours as Dr. Herweijer had ordered. That inference comes from the heated exchange Machicote observed Nurse Stecker have with Warner after he requested his pills outside the prison's normal distribution time and the subsequent change to his medication order. Viewed in the light most favorable to Machicote, this incident could be seen as Nurse Stecker prolonging his pain (or contributing to that end) with no medical justification. Administrative convenience can be a permissible factor in a prison's treatment decision, but "the Constitution is violated when [it is] considered to the exclusion of reasonable medical judgment about inmate health." *Roe v. Elyea*, 631 F.3d 843, 863 (7th Cir. 2011) (emphasis omitted).

*Third*, Nurse Stecker, knowing all she did by that point, did not consult a doctor when Machicote reported extreme pain after his original medication order ran out. She knew doctors had been treating him with narcotic-strength medication but ignored his complaints of excruciating discomfort (including a distraught and sleepless appearance noted by another nurse) to decide on her own that his treatment was adequate. Persisting in a course of treatment known to be ineffective may support an inference that a medical official recklessly ignored an inmate's serious medical condition. See *Petties v. Carter*, 836 F.3d 722, 729–31 (7th Cir. 2016) (en banc); see also *Williams v. Liefer*, 491 F.3d 710, 716 (7th Cir. 2007) (determining that a delay in treatment was actionable where

medical records showed it unnecessarily prolonged plaintiff's pain).

Any one of these incidents on its own might or might not have been enough to avoid summary judgment, but together they could support a finding that Nurse Stecker deliberately and recklessly ignored Machicote's pain. That is not to say a jury could not come to the opposite conclusion or credit Nurse Stecker's side of the story. Those decisions rest in the jurors' hands in the first instance. We hold only that Machicote is entitled to the opportunity to make his case at a trial.

B

But the district court was right to grant summary judgment to the other defendants.

None of the three doctors involved in Machicote's care demonstrated deliberate indifference to his pain. Dr. Herweijer based the initial medication order on her reasoned medical judgment, and though the prescription was for a mere three days, no evidence suggests that duration was "blatantly inappropriate." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Dr. Kuber—the physician who revised the order, seemingly to match the prison's regular medication distribution schedule—could very well have been negligent, but we find nothing in the record to suggest that he knew the change would cause Machicote serious harm. Machicote faults Dr. Hoffman for not finding out about the Tramadol delay and prescribing an alternative. Here, too, we lack factual support suggesting that Dr. Hoffman had reason to anticipate the delay. See *Arnett*, 658 F.3d at 758 (concluding that a doctor was not liable for prison staff's delay in dispensing prescribed medication).

As for Warner, the health services manager, the district court properly concluded that she did not have knowledge of Machicote's treatment or the authority to intervene in it. No evidence suggests that she was personally involved in his care beyond fielding Nurse Stecker's complaints about him. See *Minix v. Canarecci,* 597 F.3d 824, 833–34 (7th Cir. 2010) (concluding that medical director was not liable for subordinate's failure to monitor inmate's care where no facts suggested he was personally involved in it). Machicote's friends called the prison to express concerns about his treatment, but the record provides us no reason to believe Warner was unresponsive to those calls.

## III

Last we arrive at the denial of Machicote's request for counsel. We review the decision for an abuse of discretion, see *Pruitt v. Mote*, 503 F.3d 647, 658 (7th Cir. 2007) (en banc), and find none. As the district court explained, Machicote had not made sufficient efforts to find a lawyer on his own, and he appeared to be competent to litigate the case himself at that early stage. See *id*. at 654.

We pause here to make our own observation on the quality of Machicote's filings, though it has no bearing on the recruitment-of-counsel issue. He has represented himself ably in this court—advancing his arguments in clear and precise terms—and found himself in the somewhat infrequent position of having succeeded in obtaining a reversal without the assistance of a lawyer. That is no small feat given the obstacles that pro se litigants face, particularly those filing from prison. We say this only to commend Machicote, not to suggest that he would not greatly benefit from an attorney's aid at trial. He

remains free to renew his request for recruited counsel on re-mand.

For these reasons, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings.