In the

# United States Court of Appeals
### For the Seventh Circuit

No. 19-1497

JASON PERRY,

*Plaintiff-Appellant,*

*v.*

MARY R. SIMS, Ph.D., H.S.P.P., *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:17-cv-00197 — **Jane Magnus-Stinson**, *Chief Judge.*

ARGUED OCTOBER 30, 2020 — DECIDED MARCH 3, 2021

Before MANION, ROVNER, and SCUDDER, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Jason Perry suffers from serious mental illness and is serving a 70-year sentence for murdering his former wife during a fit of paranoia in 2013. Indiana prison officials have had their hands full trying to treat and control Perry's illness. In 2016, while housed in the Wabash Valley Correctional Facility in southern Indiana, Perry's condition worsened. A medical review and administrative hearing culminated in a decision to forcibly administer the antipsychotic

medication Haldol, and injections continued for about six months. Perry later sued the medical personnel who decided on this course of treatment, alleging that the forcible medication violated the Eighth Amendment's prohibition on cruel and unusual punishment and the Fourteenth Amendment's Due Process Clause. Throughout the litigation Perry asked the district court to appoint counsel to assist him. The district court denied those requests, finding that Perry not only understood his case but also quite ably prosecuted it. In the end, the district court entered summary judgment for the defendants. We affirm on all fronts.

## I

### A

Jason Perry murdered his former wife Jessica Tice in Princeton, Indiana on May 22, 2013. He pleaded guilty and received a 70-year sentence. As part of deciding where to house Perry, Indiana officials conducted a mental-health evaluation at the state's Reception Diagnostic Center in Plainfield. The examination revealed Perry's long history of mental illness, defined by two suicide attempts, severe depression, paranoid schizophrenia, and auditory hallucinations. The Indiana Department of Corrections assigned Perry to a restricted housing unit in the Wabash Valley Correctional Facility.

Over time Perry found himself disagreeing with treatment decisions made by the Wabash Valley medical team. Arguments ensued, with Perry exhibiting extreme paranoia, threatening the staff, and declining to take prescribed medications. The situation deteriorated in early 2016. By June 2016, psychologist Michael R. Mannarino observed that Perry feared and mistrusted other inmates and wanted to be transferred

into protective custody. Dr. Mannarino prescribed the antidepressant nortriptyline to ease Perry's symptoms but the facility denied the transfer request.

A second doctor, psychiatrist Brion A. Bertsch, began seeing Perry around this same time and learned that he was not taking his antidepressant "96% of the time." Dr. Bertsch further observed that Perry became agitated and accused his doctors of conspiring with inmates against him and "trying to get [him] killed." The medical staff recommended a trial run of the antipsychotic medication Geodon. Perry refused it.

About a month passed and Dr. Bertsch reported that Perry seemed more at ease and was taking his prescribed medication. Perry also agreed to take Geodon as well as a second medication to reduce the muscle stiffness that often accompanies antipsychotic medication.

But Perry's condition worsened in August 2016. He refused all medication, stopped eating because he feared someone had poisoned his food, and renewed his conspiracy claims against the Wabash Valley medical staff. Perry also threatened to kill himself if left in his cell any longer.

Concerned that Perry represented a harm to himself and others, Dr. Bertsch recommended putting him on Haldol—an antipsychotic used to control acute schizophrenia. Perry again refused, so the Wabash Valley medical team faced the question whether they should forcibly administer the drug.

The Department of Corrections has established criteria governing the involuntary medication of inmates. Those criteria require a determination that the inmate suffers from a mental illness as well as accompanying findings that medication is not only in the inmate's best medical interest, but also

that the inmate is either gravely disabled, exhibits deterioration in routine functioning, or poses a likelihood of serious harm to himself or others. The Department also assigns a Medical Treatment Review Committee to conduct a hearing on these questions.

Perry's hearing occurred on August 11. He received notice of the hearing the day before and appeared in person. Perry argued that Dr. Bertsch proposed the course of forced Haldol injections as part of an ongoing personal vendetta against him. Perry also complained that Haldol caused his muscles to lock up. He reminded the Review Committee that his medical records listed this reaction under the allergies section.

The Review Committee determined that the involuntary administration of Haldol was in Perry's best interest because he had refused food and medication, threatened suicide, and had a history of violence (including killing his former wife) during episodes of intense paranoia. No other treatment path was available, the Review Committee concluded, because Perry refused voluntary medication and "no interventions ha[d] proved effective without medication." Medical Director Michael Mitcheff promptly reviewed and affirmed the Review Committee's decision.

Perry received his first Haldol injection along with a Benadryl injection on August 11, 2016, following the Review Committee hearing. Dr. Bertsch observed that Perry experienced no complications or distress from the medication. But Perry insisted otherwise, contending that within a few days of his first Haldol injection he experienced muscle spasms, increased anxiety, difficulty breathing, chest pains, and restlessness. Dr. Mannarino visited Perry and determined that he remained mobile and was exaggerating his symptoms. When

Perry continued to complain, Dr. Bertsch halved the Haldol dosage. The injections continued regularly in three-week intervals until February 2017, when Perry left Wabash Valley and moved to the New Castle Correctional Facility. New Castle discontinued the Haldol injections, citing Perry's avowed allergy.

B

Invoking 42 U.S.C. § 1983, Perry sued the Wabash Valley medical professionals responsible for the Haldol injections. He alleged in his *pro se* complaint that the defendants exhibited deliberate indifference to his serious medical condition—his proffered Haldol allergy—in violation of the Eighth Amendment, and that the decision to proceed with the involuntary injections offended the Fourteenth Amendment's Due Process Clause.

Perry actively prosecuted his claims. He filed motions and discovery requests, survived the dismissal stage, and opposed a preliminary motion for summary judgment. He also repeatedly asked the district court to appoint him counsel as the case progressed toward summary judgment. The district court denied these requests, observing that Perry had demonstrated an understanding of the facts and law and otherwise showed himself able to litigate his claims.

In time the district court granted the defendants' motion for summary judgment. The court explained that Perry did not suffer an Eighth Amendment violation, as "there is no medical evidence to support a conclusion that Perry is allergic" to Haldol. To the contrary, Perry's complaints of muscle stiffness—which the court found were "irregular and inconsistent"—reflected a common and expected side effect of

antipsychotic medications like Haldol, and not an allergic re-
action that presented grave medical risk. Even if Perry could
demonstrate a serious medical need, the Wabash Valley med-
ical staff regularly assessed his condition, prescribed Bena-
dryl to counteract any side effect, and ultimately halved the
Haldol dosage. This course of care, the district court con-
cluded, did not constitute deliberate indifference.

Nor, the district court continued, did the defendants de-
prive Perry of due process. To the contrary, Perry benefited
from an impartial Review Committee that reasonably con-
cluded involuntary medication was in his best medical inter-
est due to his paranoia, thoughts of self-harm, and refusal to
take prescribed medication. What is more, Perry had the op-
portunity to appear and present his position, but at no point
identified "any further evidence that he could have pre-
sented."

Perry now appeals.

## II

We begin with Perry's challenges to the district court's
summary judgment rulings on the involuntary Haldol injec-
tions. Perry maintains that the forced medication offended the
Eighth Amendment and was the fruit of an unfair process that
violated the Fourteenth Amendment.

"Summary judgment is proper only if the defendants
show that no material facts are in genuine dispute and that
they are entitled to judgment as a matter of law." *Machicote v.
Roethlisberger*, 969 F.3d 822, 827 (7th Cir. 2020) (citing FED. R.
CIV. P. 56(a)). A genuine dispute over a material fact exists if
"the evidence is such that a reasonable jury could return a ver-
dict" for the nonmovant. *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986). We review the district court's grant of summary judgment *de novo*, drawing all reasonable inferences in Perry's favor. *Machicote*, 969 F.3d at 827.

## A

The framework governing an Eighth Amendment challenge to prison medical care is well established. Prison officials violate the prohibition on cruel and unusual punishment if they act with deliberate indifference to a prisoner's serious medical condition. See *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Liability arises only where an official has knowledge of a substantial risk of harm stemming from a serious medical condition and fails to take reasonable measures to mitigate the risk. See *id.* A medical condition is serious if it "has been diagnosed by a physician as mandating treatment" or "is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).

Perry insists that the Wabash Valley medical staff prescribed and continued a course of Haldol injections knowing that he is allergic to the medication. The district court was right to conclude that Perry's contention lacks support in the medical evidence. His professed allergy has not been diagnosed by a physician. What supports the contention is Perry's own self-diagnosis. In making that observation, we have no reason to doubt that Perry frequently experienced muscle tightening and locking up upon receiving Haldol injections. But the medical evidence is clear that those reactions reflect common side effects of Haldol and did not themselves constitute an excessive risk to Perry's health.

Even more, the record reflects that the defendants attended carefully to Perry's health and safety. The medical staff prescribed Benadryl with the first Haldol injection as a precautionary measure. And when Perry complained of muscle stiffness, Dr. Bertsch cut the Haldol dosage in half. The Wabash Valley medical team regularly monitored his condition and he never exhibited signs of an allergic reaction such as a rash or high blood pressure following an injection. Though the record contains a few references to labored breathing, Perry did not connect this symptom to the injections in any way. On this evidence, a jury could not find that Perry's medical team turned a blind eye to a serious medical need.

B

Nor can we say Perry was denied due process within the Wabash Valley facility. The Supreme Court has held that prisoners possess "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Washington v. Harper*, 494 U.S. 210, 221–22 (1990). A prisoner may argue he lost the protection recognized in *Harper* if the state fails to satisfy any of the following three requirements. *First*, "the state must find that medication is in the prisoner's medical interest (independent of institutional concerns)." *Fuller v. Dillon*, 236 F.3d 876, 881 (7th Cir. 2001) (citation omitted). *Second*, "the tribunal or panel that reviews a treating physician's decision to prescribe forced medication must exercise impartial and independent judgment, taking account of the inmate's best interest." *Id.* (citation omitted). *Third*, "the prisoner must be able to argue capably before a review tribunal that he does not need forced medication." *Id.* (citation omitted). Perry

contends that Wabash Valley officials failed to satisfy the first and third requirements. We see the analysis another way.

The Review Committee received sufficient information to conclude that the involuntary injections were in Perry's best medical interest. Perry has a lengthy and well-documented history of mental illness. He threatened suicide, exhibited extreme paranoia toward fellow inmates, and declined to eat or to take his prescribed medications. On this evidence—all of which was before the Review Committee—the defendants demonstrated that Perry's condition had so deteriorated by August 2016 as to warrant the forcible Haldol injections recommended by the Wabash Valley medical team. See *id.* (concluding that involuntary medication was in the patient's best interest because he "thought he was being poisoned, experienced auditory hallucinations, and tried to kill himself on two occasions").

Perry begs to differ, emphasizing that the defendants had their minds set on Haldol and never considered an alternative. Even if there is some truth in that observation, the analysis would not end there. The question under the Due Process Clause is not whether the precise medication recommended by a physician reflected the best course of treatment. See *Harper*, 494 U.S. at 231 ("[A]n inmate's interests are adequately protected, and perhaps better served, by allowing the decision to medicate to be made by medical professionals rather than a judge."). Rather, the controlling inquiry is whether the Review Committee had enough evidence to demonstrate that Perry was a danger to himself or others so as to justify the involuntary administration of Haldol. We agree with the district court's conclusion that it did.

As for the procedural aspects of the August 11 hearing, Perry appeared and had a full and fair opportunity to oppose the proposed course of treatment. He complained of being allergic to Haldol, explained his suspicion that the medical staff were conspiring against him, and reiterated his fear that he had been poisoned.

Perry's primary contention on appeal is that he had no chance at the hearing to present and cross-examine witnesses. Though our prior cases have not elaborated in detail what it means for a prisoner to "argue capably" as required by *Harper*, we are confident the record here does not support Perry's contentions. Recognize what Perry is not saying. He does not contend that the Review Panel refused to hear from this or that witness or to consider certain documents or other information he tendered at the hearing. Nor does he contend that the Review Panel declined any affirmative request he lodged at the hearing. See *McPherson v. McBride*, 188 F.3d 784, 786 (7th Cir. 1999) (rejecting the argument "that the due process clause requires the consideration of evidence that could have been but was not presented at the hearing"). On this record, no reasonable jury could conclude that the defendants deprived Perry of due process at the August 11 hearing.

### III

We close by addressing Perry's contention that the district court abused its discretion in denying his numerous requests to appoint counsel. Perry filed a total of four motions, and the district court's denials of the second, third, and fourth motions are before us on appeal. There is no way, Perry urges, that someone who suffers from such longstanding and acute mental illness—someone who prison officials could bring

under control only by forcibly injecting Haldol—could represent himself in prosecuting constitutional claims in federal court.

At that level of generality, Perry's position has something to it. But we cannot decide the appeal at that level. To do so would be tantamount to mental illness creating a legal entitlement to the appointment of counsel. The law does not support this categorical proposition. We need to go deeper into the facts and circumstances and ask, as the district court did, whether Perry, notwithstanding his history of mental illness, appeared capable of representing himself. Of course, mental illness is a pertinent and important factor, but it does not itself resolve the question. The controlling framework instead comes from our *en banc* decision in *Pruitt v. Mote*, 503 F.3d 647 (7th Cir. 2007).

In *Pruitt* we explained that a district court confronted with a motion for the appointment of counsel under 28 U.S.C. § 1915(e)(1) must ask two questions. First, the court must consider whether the indigent plaintiff "made a reasonable attempt to obtain counsel or [has] been effectively precluded from doing so." *Id.* at 654. And if so, second, the court must consider whether he appears competent to litigate on his own, considering the complexity of the case. *Id.*

All agree that Perry satisfied his threshold burden of trying on his own to recruit counsel. The district court therefore focused on the second question: "whether the difficulty of the case—factually and legally—exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself." *Id.* at 655. This inquiry is a practical one, and "the court should consider any available relevant evidence." *Eagan v. Dempsey*, 2021 WL 456002, at *9 (7th Cir. Feb. 9, 2021).

We review the district court's denial of a § 1915(e)(1) motion for an abuse of discretion, asking "not whether we would have recruited a volunteer lawyer in the circumstances, but whether the district court applied the correct legal standard and reached a reasonable decision based on facts supported by the record." *Pruitt*, 503 F.3d at 658.

The district court applied these exact principles and determined that Perry ably litigated his case on his own. We see no abuse of discretion. As the district court recognized, Perry's claims are not so complex as to require the assistance of counsel. Perry showed he understood the facts, including the information in his medical records, and was able to marshal those facts into coherent arguments in support of both of his claims.

To be sure, our court has emphasized that constitutional claims involving the defendant's state of mind—like the subjective deliberate-indifference analysis—may entail meaningful complexity. See *Eagan*, 2021 WL 456002, at *9. The same is true for claims involving complex medical issues. See *id.; Pruitt*, 503 F.3d at 655–56. But we have resisted hard and fast rules in this context, preferring instead to focus on the actual experience of the particular *pro se* litigant. See *Pruitt*, 503 F.3d at 656. We chart that same course here.

We see no error in the district court's assessment of Perry's case as falling on the less complex, more manageable side of the spectrum. See *id.* at 655 (recognizing that complexity and competence are "necessarily intertwined"). Yes, Perry has but a tenth-grade education, limited access to legal materials and writing supplies, and minimal litigation experience. But the district court witnessed firsthand that Perry, who later earned a GED, exhibited no meaningful difficulty describing the facts

or conveying his arguments in many "comprehensible filings." All of this left the district court of a mind that Perry, despite undeniably suffering from mental illness, could represent himself.

Our own review of Perry's filings in the district court leaves us with the same impression. Perry's complaint was plenty coherent and survived the dismissal stage. See 28 U.S.C. § 1915A(b). All the more impressive, Perry successfully opposed the defendants' preliminary motion for summary judgment. Perry's success on this latter score is no small feat given the obstacles *pro se* litigants—and especially *pro se* prisoners—often face. Perry's brief in opposition to summary judgment recognized the issues presented and was well-organized with numbered headings and a coherent substantive analysis. The brief identified controlling legal authority, including Federal Rule of Civil Procedure 56, the Prison Litigation Reform Act, and numerous binding cases.

Along the way in the district court Perry likewise demonstrated familiarity with discovery procedures. He filed a motion for court-issued subpoenas, as well as a request for the production of documents from the defendants in which he correctly identified Federal Rule of Civil Procedure 34, defined the term "document," and advanced detailed, relevant, and precise requests in a well-presented submission. Although Perry contends that the discovery process posed challenges—a reality we readily accept—the district court fairly observed that "[t]o the extent that Mr. Perry states that he has been unable to pursue discovery, he has not identified specific discovery that he has not been able to obtain."

No doubt some of Perry's filings in the district court were more articulate than others. Nor do we disagree with Perry

that the district court could have added more detail to some of the orders denying his requests for the appointment of counsel. In the end, though, what remains of overarching importance is that the district court applied the correct legal standards from *Pruitt* and exercised its discretion on rationales reasonably supported by the record. We see no abuse of discretion by the district court, and our analysis can end there.

Even if we took the next step in the *Pruitt* sequence and considered whether Perry has made the requisite showing of prejudice, he would fare no better. See 503 F.3d at 659. Suffice it to say that Perry did not have the upper hand on the merits of his two claims. The Wabash Valley medical staff responded to the very difficult challenges Perry presented with diligence and care, not deliberate indifference. And the decision to forcibly administer Haldol was the product of a fair and reasonable process that included input from Perry himself. Our review of the record leaves us with the conviction that there is not "a reasonable likelihood that the presence of counsel would have made a difference in the outcome of the litigation." *Id.* (emphasis omitted).

For these reasons, we AFFIRM.