In the

# United States Court of Appeals
## For the Seventh Circuit

No. 22-1694

MARIO ARCE,

*Plaintiff-Appellant,*

*v.*

WEXFORD HEALTH SOURCES INC.,
*et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:18-CV-1348 — **Nancy J. Rosenstengel**, *Chief Judge.*

ARGUED MAY 18, 2023— DECIDED JULY 27, 2023

Before WOOD, LEE, and PRYOR, *Circuit Judges.*

WOOD, *Circuit Judge.* Inmate Mario Arce got a sharp knee in the thigh while he was playing soccer at Illinois's Pinckney-ville Correctional Center on June 18, 2017. Ever since then, he has suffered from severe leg pain, which the prison's medical providers ultimately concluded was attributable to a blood clot. But although Arce's blood clot was successfully treated, his pain persisted. Arce sued Wexford Health Sources, which

provides medical care at the prison under contract with the state, and two of its employees, claiming that they were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. The district court granted summary judgment for the defendants, concluding that "[w]hile Arce's treatment does not seem completely seamless, it does not rise to the level of deliberate indifference." We affirm.

**I**

Immediately after his fellow inmate kneed Arce in the right thigh during a soccer match, Arce saw the prison's Medical Director, defendant Dr. Alberto Butalid. Dr. Butalid examined Arce and noted that his right thigh was painful, swollen, and tender. Concerned about a possible fracture or ruptured muscle, Dr. Butalid promptly sent Arce to the local emergency room at Pinckneyville Hospital for a more thorough evaluation.

The treating physician at Pinckneyville Hospital examined Arce and became concerned that the incident might have caused Arce to develop "compartment syndrome," which the parties define as a serious medical condition that "occurs when there is increased pressure in a compartment of the body that results in insufficient blood supply to tissue." Compartment syndrome requires emergency surgery to relieve the pressure; if surgery is not conducted, the pressure can result in tissue death (*i.e.*, necrosis) and permanent muscle damage. The Pinckneyville Hospital physician transferred Arce to Saint Louis University Hospital so that Arce could be evaluated by an orthopedic specialist.

At Saint Louis University Hospital, an orthopedic specialist tested Arce for compartment syndrome using a diagnostic

tool known as a "strike test," which involves inserting needles into the affected area to measure the level of pressure in the tissue. Arce's strike test results are not in the record, nor are any notes from the orthopedist. Arce contends that the orthopedic specialist informed him that he needed to be re-tested in two days to determine if he needed surgery. But the treating physician's notes in Arce's medical records do not include that advice. Instead, they indicate only that the orthopedist concluded that Arce was "clear for discharge" and recommended a follow-up visit in one week with an outpatient primary care provider.

Arce's official diagnosis upon discharge was a "right thigh contusion," more commonly known as a bruise. The hospital certified that Arce was "stable" and "fit for confinement." The discharge notes also instructed him to "[f]ollow up with Affinia Healthcare Murphy O'Fallon. Schedule an appointment as soon as possible for a visit in two days." The hospital staff did not prescribe any medication or other treatment.

Once back at Pinckneyville, Arce was held overnight in the infirmary. The staff there gave him crutches, low bunk and low galley permits, and Motrin (that is, ibuprofen) for his pain. The next day, defendant Nurse Practitioner Bob Blum attempted to carry out the hospital discharge instructions by submitting an "urgent" request to Wexford that Arce be seen in two days for a follow-up appointment at Affinia Healthcare, the location identified in the discharge notes.

Wexford, however, does not refer inmates to outside providers willy-nilly. It requires referrals to offsite medical providers to be approved through a process known as "collegial review," in which a facility's medical director and a representative of Wexford's "utilization committee" review the

patient's medical file and the treatment request. The parties dispute the extent to which the cost of the requested treatment is the decisive factor in collegial review discussions, though Wexford itself describes collegial review as a "process designed to reduce offsite care costs." Nurse Practitioner Blum thus had to seek approval through collegial review before the discharge instructions could be implemented. He was unsuccessful. Notes from the collegial review denial indicate that Dr. Butalid and a non-Wexford physician interpreted Nurse Practitioner Blum's referral as indicating that Arce was diagnosed with no more than a "right thigh hematoma," and that there was "no fracture" and "no evidence of compartment syndrome." On that understanding, they concluded that Arce needed only on-site follow-up care.

Arce's next appointment was on June 28, 2017, with Nurse Practitioner Blum. Arce complained of extreme pain and requested something stronger than Motrin, but to no avail. After the examination, Nurse Practitioner Blum recommended that Arce (1) continue with crutches and Motrin, (2) be evaluated for physical therapy, and (3) receive an ultrasound to rule out deep vein thrombosis, a condition caused by a blood clot. Nurse Practitioner Blum also renewed the request for an orthopedic follow-up appointment to rule out compartment syndrome. The next day, Wexford approved the ultrasound but denied the orthopedic visit until the results from the ultrasound could be reviewed.

After the ultrasound on July 7, Arce was diagnosed with a blood clot in his right leg. He was prescribed blood thinners to treat the clot and Motrin to relieve pain, and he was held in the prison healthcare unit for five days to monitor his recovery. On July 9, Dr. Butalid examined Arce and noted that he

was "doing better with less pain and swelling in his right leg." Arce denies that those notes accurately reflect his condition at the time and maintains that he was in fact in severe pain.

From this point on, Arce's treatment consisted mainly of regular physical therapy, medications to treat the blood clot, occasional follow-up visits at the healthcare unit, and monitoring to ensure that no new clot had developed.

Meanwhile, Arce continued to complain to Wexford staff and his physical therapist about the pain in his leg. His complaints (he said) were ignored by defendants. Rather unsympathetically, Nurse Practitioner Blum told him that he was "not going to get high grade medicine here" and was "lucky to be getting anything." Nevertheless, the record shows that the defendants prescribed Arce different pain medications throughout the next year. On July 20, 2017, Dr. Butalid ordered Arce a one-week prescription for the narcotic Ultram, but he did not renew the prescription. For the next few months, Arce was offered over-the-counter drugs such as Motrin and Tylenol. Eventually, Nurse Practitioner Blum suspected that Arce's pain might be neuropathic (nerve-related), and so on October 27, 2017, he prescribed nortriptyline, a prescription-only medication used to treat neuropathy.

On November 27, 2017, a nondefendant Wexford employee sent Arce to the local emergency room because of pain and swelling in his leg. He was discharged with no new diagnosis. The hospital discharge instructions recommended only ibuprofen and naproxen—both over-the-counter anti-inflammatories—as needed. When Arce continued to complain of pain, Nurse Practitioner Blum immediately increased his dosage of nortriptyline. At an appointment with Dr. Butalid on March 11, 2018, Arce again complained that nortriptyline was

not alleviating his pain. Dr. Butalid prescribed Neurontin, a different neuropathic medication. When, a few days later, the Neurontin prescription was denied in collegial review, it was replaced with a prescription for duloxetine, another neuropathic medication. About a month later, on April 5, 2018, Dr. Butalid gave Arce another one-week prescription for the narcotic tramadol (the generic version of Ultram).

Eventually, Arce's blood clot was successfully dissolved. Arce asserts that he nonetheless has never regained his full range of motion in his right leg and that his pain continues.

On July 2, 2018, Arce sued Nurse Practitioner Blum, Dr. Butalid, and Wexford for violating his Eighth Amendment right to be free from cruel and unusual punishment through their deliberate indifference to his serious medical condition. (He also sued one other Wexford employee, but the district court granted summary judgment on that claim because Arce failed to exhaust his administrative remedies as to that defendant. Arce does not pursue that claim on appeal.)

Arce's complaint advances four theories to demonstrate an Eighth Amendment violation. First, he alleges that the defendants failed to rule out or treat compartment syndrome as the cause of his pain and swelling by denying him a follow-up visit with an orthopedic specialist. Second, he asserts that the defendants delayed his medical treatment by refusing to provide a follow-up appointment until ten days after his initial hospital visit. Third, he argues that the defendants refused to relieve his suffering by prescribing him stronger pain medication. And fourth, he claims that Wexford's policies of "collegial review" and "utilization management" operated to deny him needed medical treatment for reasons of cost.

The district court granted summary judgment for the defendants. It concluded that Arce had not offered any evidence that would allow a jury to find that (1) he suffered from compartment syndrome, (2) the ten-day follow-up visit (rather than a two-day or one-week follow-up) caused him any additional harm, or (3) defendants were deliberately indifferent to his pain, given that they "prescribed a variety of pain medications upon complaints from Arce over the course of his treatment—including nerve pain medication and narcotics." As for Wexford, the court concluded that there was no evidence "to suggest that Arce's specific needs were disregarded solely because of costs." Arce appealed.

## II

We evaluate *de novo* a district court's grant of summary judgment, construing all facts and inferences in the light most favorable to the nonmoving party. *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 861 (7th Cir. 2010). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"The Eighth Amendment proscribes 'deliberate indifference to serious medical needs of prisoners' amounting to 'the unnecessary and wanton infliction of pain.'" *Stockton v. Milwaukee County*, 44 F.4th 605, 614 (7th Cir. 2022) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). It is common ground for present purposes that Arce's leg injury and subsequent blood clot were serious medical conditions. The remaining question is whether Arce has presented enough evidence to permit a trier of fact to conclude that the defendants were deliberately indifferent in treating these conditions and that their allegedly inadequate care caused him harm. See *id.*

Deliberate indifference requires "[s]omething more than negligence or even malpractice." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Proving deliberate indifference can be difficult in situations where a medical professional has provided at least some treatment in response to a plaintiff's complaints. But "we have rejected the notion that the provision of some care means the doctor provided medical treatment which meets the basic requirements of the Eighth Amendment." *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016) (*en banc*). More is necessary. For example, a plaintiff may show deliberate indifference by showing that a medical professional's decision "is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." *Johnson v. Rimmer*, 936 F.3d 695, 707 (7th Cir. 2019) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982)). And even if a defendant eventually pursues an acceptable course of treatment, she still may violate the Eighth Amendment if she is deliberately indifferent to an unjustifiable delay that "exacerbated the inmate's injury or unnecessarily prolonged his pain." *Perez v. Fenoglio*, 792 F.3d 768, 777–78 (7th Cir. 2015).

With these guideposts in mind, we turn to Arce's claims against the two individual defendants, Nurse Practitioner Blum and Dr. Butalid.

A

Arce first asserts that he suffered from compartment syndrome and that defendants' failure to diagnose and treat this condition caused his long-term leg injury. But after five years and numerous visits to various health professionals (Wexford and non-Wexford alike), Arce has no evidence that this is the case. Nothing in the record aside from his lay speculation

indicates that he experienced tissue necrosis in his right thigh, which the parties agree is the primary consequence of untreated compartment syndrome. Nor does Arce proffer any expert testimony or the results of any medical exam opining that his symptoms are consistent with untreated compartment syndrome. All he has is his own testimony that the orthopedist who examined him at St. Louis University Hospital thought that he would benefit from further testing for that condition. Even if that is what the doctor said, however, this falls well short of evidence that Arce actually *had* compartment syndrome. Defendants cannot be held liable for failing to diagnose Arce with a condition unless there is at least some evidence upon which a reasonable jury could conclude that Arce had it.

The rest of the case unravels with that critical preliminary problem. Arce has not shown that defendants acted with deliberate indifference by denying the recommended two-day follow-up appointment at Affinia Healthcare. Nurse Practitioner Blum submitted an urgent request for this follow-up appointment at least twice, but he lacked the authority to arrange for offsite care without Wexford's approval. And Arce fails to explain why Nurse Practitioner Blum's attempts to secure the follow-up appointment were so inadequate as to amount to deliberate indifference.

As for Dr. Butalid, Arce fails to show that his denial of the requested two-day follow-up appointment was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that [he] actually did not base the decision on such judgment." *Johnson*, 936 F.3d at 707. The record shows that Dr. Butalid believed that there was "no evidence of compartment syndrome." Nothing in the

record suggests that Dr. Butalid's understanding of the situation was incorrect or that he was subjectively aware that Arce's condition was more serious than a badly bruised thigh. Nor is there any evidence that his decision to deny an urgent follow-up with an outside specialist amounted to "a substantial departure from accepted professional judgment." *Johnson*, 936 F.3d at 706–07. To the contrary, the record suggests that at least one other doctor (the emergency room physician who oversaw Arce's care at St. Louis University Hospital) also believed that a follow-up appointment with a primary care provider in one week was sufficient.

In sum, Arce has provided no evidence from which a reasonable jury could conclude that he suffered from compartment syndrome or that defendants were deliberately indifferent in failing to diagnose him with that condition.

B

Relatedly, Arce alleges that defendants violated the Eighth Amendment by failing to provide follow-up care until ten days after his initial hospital visit. Delay of medical care, including follow-up appointments, can amount to an Eighth Amendment violation in certain circumstances. See *Zaya v. Sood*, 836 F.3d 800, 805–06 (7th Cir. 2016). But Arce does not provide any evidence from which a reasonable jury could conclude that a ten-day wait for follow-up care was unreasonable for a patient diagnosed with a bruise on the right thigh.

If Arce was indeed experiencing compartment syndrome, his allegations of delay may have had more merit because of the time-sensitive nature of that condition. But as discussed above, the compartment-syndrome theory is a nonstarter. And Arce offers no other evidence to suggest that a wait of ten

days was a radical departure from "accepted professional practice" such that "a jury may infer from the treatment decision itself that no exercise of professional judgment actually occurred." *Id.* at 805 (citing *Pyles*, 771 F.3d at 409). Even if this was somewhat longer than the period recommended by the hospital staff, Arce must do more than show a mere difference of opinion among doctors. See *Pyles*, 771 F.3d at 410 ("Disagreement … between two medical professionals[ ] about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation.").

Furthermore, Arce's delay theory fails for another reason: he provides no evidence that the ten-day gap in medical care caused him some harm that could have been avoided had the follow-up been sooner. See *Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007) ("In cases where prison officials delayed rather than denied medical assistance to an inmate," a plaintiff must show "that the delay (rather than the inmate's underlying medical condition) caused some degree of harm."). To the extent that Arce complains about other alleged delays throughout his treatment, those theories suffer from the same fatal flaw.

C

Arce next argues that defendants violated the Eighth Amendment by failing to prescribe him more potent painkillers. The constitutional prohibition on inflicting unnecessary and wanton pain requires medical officials who know that an incarcerated patient is suffering to take "reasonable measures" to alleviate that pain. See *Arnett v. Webster*, 658 F.3d 742, 753–54 (7th Cir. 2011). But the Eighth Amendment does not entitle incarcerated patients to their preferred pain medication, *id.* at 754, nor does it impose the unrealistic

requirement that doctors keep patients completely pain-free, *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). There are many reasons for doctors to tread carefully when prescribing strong pain medications. See *id.* at 591 ("The administration of pain killers requires medical expertise and judgment. Using them entails risks that doctors must consider in light of the benefits."). To survive summary judgment, Arce must provide some evidence from which a reasonable jury could conclude that defendants were deliberately indifferent to his pain. This might include evidence that defendants "persist[ed] in a course of treatment known to be ineffective," *Machicote v. Roethlisberger*, 969 F.3d 822, 828 (7th Cir. 2020), or evidence that defendants' recommended course of treatment was "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Arnett*, 658 F.3d at 751 (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)).

The record here lacks any such evidence. This is not a case where defendants failed to provide any pain relief whatsoever. In the year after Arce's injury, Arce was prescribed Motrin (and its generic, ibuprofen), Tylenol, Ultram (and its generic, tramadol), nortriptyline, Neurontin, and duloxetine to address his pain. This is not a case where defendants completely refused to respond to Arce's complaints that the medication he was receiving was ineffective. The record shows quite the opposite: Nurse Practitioner Blum and Dr. Butalid repeatedly altered Arce's pain medication in response to his complaints. In addition, they successfully diagnosed and treated his blood clot, which they believed to be the major underlying medical condition causing his pain.

In short, this record lacks evidence that would permit a jury to conclude that the defendants' response to Arce's pain was so "blatantly inappropriate" that it demonstrated deliberate indifference. *Pyles*, 771 F.3d at 409. Moreover, there is no expert testimony or other evidence that suggests that "no minimally competent professional" would have acted as defendants did. *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008) (quoting *Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998)). To the contrary, both times Arce was treated by non-Wexford hospital staff, he was given only over-the-counter medications for his pain. Because Arce has failed to provide evidence that defendants' responses to his complaints of severe pain were inadequate, his Eighth Amendment claim fails.

D

Finally, Arce argues that Wexford's system of collegial review and its policy of requiring its medical providers to prefer certain medications violated the Eighth Amendment because it led to the denial of his outside follow-up appointment and certain pain medications.

We analyze Arce's claim against Wexford under the framework set out in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). "*Monell* governs Wexford's liability in this case because we, like our sister circuits, treat private corporations acting under color of state law as municipalities." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021).

Even if we were to agree with Arce that Wexford was aware that its policies created a substantial risk of depriving inmates of adequate medical care, Arce cannot prevail, because no jury could find that he was harmed by Wexford's

policies. As discussed above, Arce provides no evidence that the medical treatment he received in response to his initial leg injury, his subsequent blood clot, and his ongoing pain was inadequate. Arce's claim against Wexford therefore fails. See *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1035 (7th Cir. 2019) (affirming summary judgment for Wexford where the plaintiff could not show that he had suffered harm as a result of his medical treatment in prison).

### III

We AFFIRM the district court's grant of summary judgment for the defendants.